

**FOX ROTHSCHILD LLP**
Formed in the Commonwealth of Pennsylvania
By:     Frank E. Derby, Esquire (FD 2190)
        Thomas R. Hower, Esquire (TH 9793)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
Attorneys for Plaintiffs, Mark Imperatore and Daun Imperatore

## 04 CV 8921

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ─────────────────────────── X | |
| MARK IMPERATORE AND DAUN IMPERATORE, | Civil Action No. |
| Plaintiffs, | |
| v. | |
| LEONARD Y. LEE, M.D., RICHARD CARTLEDGE, M.D., ADVANCED CANNULA, INC., WEILL MEDICAL COLLEGE OF CORNELL UNIVERSITY, NEW YORK - PRESBYTERIAN HOSPITAL, | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |
| ─────────────────────────── X | |

Plaintiffs Mark Imperatore ("Mark") and Daun Imperatore ("Daun") make

allegations against defendants Leonard Y. Lee, M.D. ("Lee"), Richard Cartledge, M.D.

("Cartledge"), Advanced Cannula, Inc. ("Cannula"), Weill Medical College of Cornell University ("WMC") and New York Presbyterian Hospital ("NYPH") as follows:

## THE PARTIES

1.    Mark is a citizen of New Jersey residing at 748 Galloping Hills, Franklin Lake, New Jersey.

2.    Daun is a citizen of New Jersey residing at 748 Galloping Hills, Franklin Lake, New Jersey.  She is Mark's wife.

3.    Lee is a citizen of New York and a doctor licensed to practice medicine residing at 435 East 70th Street, New York, New York.

4.    Cartledge is a citizen of Florida and a doctor licensed to practice medicine with an office located at 1150 North 35th Avenue, Suite 440, Hollywood, Florida.

5.    Cannula is a Nevada corporation with a principal place of business located at 435 East 70th Street, New York, New York.

6.    WMC is a medical college that trains physicians with a principal place of business located at 1300 York Avenue, New York, New York.

7.    NYPH is a hospital with a principal place of business located at 710 West 168th Street, New York, New York.

## JURISDICTION & VENUE

8.    This Court has jurisdiction over this action, under 28 U.S.C. § 1331 because this action arises under the Federal securities laws of the United States, 42 U.S.C. §§ 1395, *et seq*.

9.    This Court also has jurisdiction over this action under 28 U.S.C. § 1332 inasmuch as all defendants are residents of different states then all plaintiffs and the

amount in controversy exceeds $75,000 exclusive of fees, interest and costs.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a).

10.     Venue is this District is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims have occurred in this Judicial District.

## MARK'S LIFE-THREATENING HEART CONDITION

11.     In November 2001, Mark had congestive heart failure that required an aortic dissection on an emergency basis.

12.     Mark's aorta was distended to 11 centimeters, while a normal aorta is about 2.8 centimeters.

13.     After careful consideration of various surgical options, Mark chose Leonard Girardi, M.D. and his team to perform the surgery at NYPH.

14.     Dr. Girardi was chosen because of the excellent reputation as a heart surgeon enjoyed by he and his team of surgeons and NYPH also has a worldwide reputation for excellence in heart surgery and an excellent medical staff.

15.     Dr. Girardi  labeled plaintiff's case as a difficult one because of the size of plaintiff's aorta and his weight.

16.     Plaintiff's surgery was performed on November 27, 2001 and was successful.

17.     Dr. Cartledge assisted in Mark's heart surgery with Dr. Girardi.

18.     Mark understood the serious nature of his heart condition because he had a prior similar procedure and he was greatly impressed by the doctors on Dr. Girardi's

team to whom he owed his life.  He was also recently married to Daun and had a seven month old daughter, Laina.

19.     Daun was greatly relieved by Dr. Cartledge's assurances and impressed by his energy and willingness to provide immediate assistance to her and Mark after the surgery.

20.     Daun and Mark would become more and more willing to rely on Dr. Cartledge because of his medical skills and willing attitude to be of service to them.

21.     Seriously ill patients who have significant heart surgery develop an implicit trust in their doctors that borders on deification.

### MARK'S PROMINENT FAMILY

22.     The Imperatore Family is well known in the New York metropolitan area for their considerable business interests in the transportation industry and their extensive charitable philanthropy.

23     Mark's father and uncles founded and developed APA Transport in North Bergen, New Jersey which became one of the largest trucking companies in the United States.

24     Mark's Uncle Arthur developed The New York Waterway ferry service between Weehawken, New Jersey and New York City.

25     Mark's father and uncles founded and developed Imperatore Courier Service in Little Ferry, New Jersey.

26     Mark's father was on the board of directors of Valley Hospital in Ridgewood, New Jersey for many years. Mark's father and uncles have donated over one million dollars to Palisades General Hospital in North Bergen, New Jersey.  Mark's

4

father and uncles have also made substantial monetary contributions to Englewood Hospital in Englewood, New Jersey. Mark's father and uncles have also made significant monetary contributions to the Deborah Heart and Lung Foundation.

## MARK IS IDENTIFIED AS "VIP" AND RECEIVES SPECIAL TREATMENT FROM NYPH

27.    After the surgery, Dr. Cartledge told Mark that when he was admitted to NYPH, Mark was identified as a VIP because he was an affluent person from a prominent family. Dr. Cartledge also said that Mark was to receive "red carpet" treatment from the doctors and that this VIP status was widely known among the staff.

28.    Mark received a private room while he was a patient at NYPH. Mark was not billed for a private room by NYPH.

29.    Doctors came in to treat Mark on their days off; they did not just phone in instructions to available staff.

30.    Mark did not request this designation nor special treatment from WMC or NYPH.

## DR. CARTLEDGE DOMINATES MARK'S POST-OPERATIVE CARE

31.    After the surgery as Mark was in the intensive care unit, Dr. Cartledge immediately met Daun and told her that he was personally assigned to Mark's case and was there to assist Mark and his family in any possible way.

32.    Dr. Cartledge handled a weekend emergency after Mark's surgery when Dr. Girardi was unavailable. When Mark's health was showed signs of failing, Dr. Cartledge immediately came into the hospital and ordered a blood transfusion for Mark, which reversed Mark's slide.

5

33.     Dr. Cartledge told Mark and Daun that he was their personal "MP" or medical professional.  He did this on numerous occasions.  Dr. Cartledge's interest in Mark, however, clearly extended beyond his health.

34.     Dr. Cartledge spent significant amounts of time on numerous occasions in conversation with Mark.  In addition to discussions about Mark's health, Dr. Cartledge primarily discussed his own background as an inventor of medical devices.  Dr. Cartledge described himself as a "boy wonder" who completed his undergraduate degree and medical degree in only six years.

35.     Dr. Cartledge asked for Mark's advice as a business man regarding funding for the development of his medical inventions.

36.     Mark was discharged from the hospital on December 5, 2001.

37.     At the time of Mark's release, Dr. Cartledge gave Mark a handwritten note with his personal home and beeper numbers and told Mark to contact him at any time.

38.     After Mark's release, Dr. Cartledge regularly called Mark to prescribe medications, ask about Mark's health arrange meetings and discuss his inventions with Mark and funding for his medical inventions.

39.     Dr. Cartledge and Mark participated in numerous telephone conversations and in-person meetings, including several lunch meetings in New York City in or about January and February 2002.

40.     Mark received treatment that far exceeded the type of care received even by post-operative heart patients.

41.     Dr. Cartledge examined Mark in his apartment in New York City. It was during one of these examinations that Dr. Cartledge suggested that Mark invest in one of

his projects known as Advanced Cannula, Inc.  Dr. Cartledge told Mark that Dr. Lee who was also on Dr. Girardi's team, was involved in this project and suggested that the three men meet as soon as possible.

42.    Based on the high level of trust reposed in a physician who took such an intense interest in his health, Mark indicated that he would consider the investment.

## MARK IS WORKED ON BY DRS. CARTLEDGE AND LEE TO INVEST MONEY IN ADVANCED CANNULA, INC.

43.    Cannula was supposedly based on an invention by Dr. Lee of a cannula device and Dr. Cartledge was a shareholder in the business.  Some information concerning Cannula was provided to Mark.

44.    Cannula was discussed during a dinner meeting with Dr. Cartledge in or about January 19 or 20, 2002 with Mark and Daun and a friend of their's who worked in the financing of medical enterprises.  The dominant dinner conversation concerned Dr. Cartledge's background and inventions.

45.    In or about April 2002, Mark met both Drs. Cartledge and Lee in Dr. Cartledge's New York City apartment.  Both Doctors examined Mark and Dr. Cartledge told Mark that Dr. Lee was on Dr. Girardi's surgical team and knew all about his medical case.

46.    Dr. Cartledge's communication with Mark regarding Cannula continued steadily and he told Mark that while Cannula was offering private placement investments to third parties, they really wanted Mark to be a part of this project  because they liked him and because of his great business acumen.  Dr. Cartledge said it would be "great" to be partners with Mark.

7

47.     Drs. Cartledge and Lee told Mark that Dr. Girardi was interested in the investment, that he was "drooling to get in," but that they did not want him as a partner because "he had too much money already and they did not want to mix business with pleasure." They also told Mark that Dr. Girardi was "sold on the product" and that he would use it "in a second" in his practice, exclusively.

48.     Drs. Cartledge and Lee also told Mark several times that they had another financing deal on the table and that he would kick himself if he did not invest in Cannula.

49.     Mark and Daun were also told that they would get their money back from Cannula in 90 days and "was are your doctors. If you cannot trust us, who can you trust."

## MARK IS PRESCRIBED EXCESSIVE AMOUNTS OF PAIN KILLING PRESCRIPTION DRUG BY DR. CARTLEDGE.

50.     Dr. Cartledge began prescribing medications, including narcotic pain killers, as soon as Mark's surgery was completed and for several months thereafter despite the fact that Drs. Girardi and Montgomery, Mark's cardiologists were also writing such prescriptions.

51.     In or about January 2002, Mark's wife contacted Dr. Cartledge because of her concern regarding Mark's use of the pain killing pills. Her concern was based upon her own observation and the opinion of Mark's cardiologist, who was also referred by Dr. Girardi. Dr. Montgomery was concerned that Mark's consumption of pain killers was excessive and that he should be weaned off of them.

52.     Daun was concerned that Mark's mental state was deteriorating based on the effects of the pills he was taking. He would become very emotional at inappropriate

times and would frequently cry for apparently no reason at all. She feared that Mark was in a deepening depression induced by the pain killers.

53.    Dr. Montgomery was unaware that Dr. Cartledge was also prescribing pain killers for Mark. Dr. Cartledge, however, knew that Drs. Montgomery and Girardi were also prescribing pain killers.

54.    Dr. Cartledge told Daun that Mark needed the pain killers and discounted Dr. Montgomery's concern that the amount of pain killers Mark was taking was excessive.

## MARK GETS FORMAL SOLICITATION LETTER AND FINALLY
## GIVES A DEPOSIT

55.    The communications from Drs. Cartledge and Lee continued as did the pressure for Mark to invest in Cannula unabated.

56.    On or about June 15, 2002, Mark received a solicitation letter from Drs. Cartledge and Lee seeking a commitment to invest in Cannula in the amount of $333,333.00.

57.    Mark invited his new friends Drs. Lee and Cartledge to his family's summerhouse in Maine for the Fourth of July holiday.

58.    In Maine, Mark was again told that Dr. Girardi was "drooling" to get into the investment.

59.    Drs. Cartledge and Lee arrived at the Maine house late on Saturday, July 6, 2002. They continued to pressure Mark regarding the investment in Cannula.

60.    Mark gave them a check for $65,000.00 as a down payment on his investment.

61.     Drs. Cartledge and Lee did not stay for the weekend as they planned. They left the next day, Sunday, July 7, 2002.

62.     Drs. Cartledge and Lee continued to seek the full amount of the investment from Mark.  They told Mark that they would not return the deposit to him. They assured him by saying "trust us, we are surgeons, this invention is revolutionary, we know our stuff."

63.     On one occasion, Dr. Lee remained Daun "What about your commitment and obligation to us?  You promised this money to us."

64.     Drs. Cartledge and Lee also gave Mark instructions with respect to what to say about their relationship with them to Dr. Girardi.  Mark was told not to "let on" that he had a relationship outside the office with Drs. Cartledge and Lee because Dr. Girardi frowned on outside relationships and it was not comfortable for Drs. Cartledge and Lee.

## THE SUBSCRIPTION AGREEMENT IS EXECUTED AND

## MARK AND DAUN FUND THE INVESTMENT;

## DR. CARTLEDGE LEAVES FOR FLORIDA

65.     Drs. Cartledge and Lee continued to apply pressure to have Mark sign an investment subscription agreement and to fully fund his investment.

66.     In or about July or August, 2002 Dr. Cartledge completed his fellowship at WMC and moved to Florida where he had taken a job at another hospital.

67.     Following Dr. Cartledge's departure, Dr. Lee talked to Mark more and he provided medical care to Mark without Dr. Cartledge.

LV1 288553v2 11/10/04

68.     Drs. Cartledge and Lee told Mark that there were significant new developments with respect to Cannula and that there was another investment deal on the table and that Mark would kick himself if he did not fully invest in Cannula immediately.

69.     Drs. Cartledge and Lee also told Mark many times that if he did not invest soon, he would lose his opportunity to invest in a deal that would make him rich.

70.     Mark and Daun executed a Shareholder Agreement with respect to Cannula share dated November 1, 2002. See Exhibit "A."

71.     Mark and Daun finally signed the Investment Subscription Agreement on November 6, 2002 and offered the full investment amount which totaled $200,000.00. See Exhibit "B."

72.     Upon completion of these tasks, Mark and Daun asked Dr. Lee about the significant new developments and were told that he could not give them any information until their check cleared.

73.     Mark and Daun told Drs. Cartledge and Lee that all money invested in Cannula was borrowed by them.

74.     Dr. Lee also assured them that stock certificates in Cannula would be issued immediately and that they would receive an accounting of the prototype costs, which was the next step for Cannula.

75.     Two days later, Mark and Daun made the same requests to Dr. Lee and they were told that their check had not cleared yet so he could not share any information.

76.     Mark's subsequent requests of Drs. Cartledge and Lee for information about Cannula and the new development were unanswered, but always with promises that information would be forthcoming.

77.     At an office visit with Dr. Girardi, Mark finally asked him casually about the supposed cannula invention and Dr. Girardi told him that he knew nothing about it. This shocked Mark because he believe that Dr. Girardi knew about the invention and would use it in his practice.

78.     Mark and Daun heard from Drs. Cartledge and Lee less and less as time passed and Mark had to initiate any contact with them. Drs. Cartledge and Lee acted as if they did not want to speak to Mark at all.

79.     Mark repeated his demands for a stock certificate for his investment in Cannula.

80.     After receiving no information about the investment or any response to repeated requests for information to Drs. Cartledge and Lee, Mark and Daun, though their attorney, finally sent a letter demanding the return of their investment dated March 28, 2003. See Exhibit "C." The Subscription Agreement contains a "termination clause" at sections 2.3 and 2.4.

81.     Mark and Daun finally received a stock certificate for Cannula filled out with ball point pen dated April 1, 2003, days after Mark and Daun's termination letter. See Exhibit "D."

82.     Drs. Cartledge and Lee have refused repeated demands to return the investment money to Mark and Daun.

## Count One
### Federal and New Jersey Securities Fraud

83.     Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 82, as if set forth in full herein.

84.     Mark and Daun are New Jersey residents.

85.     Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun that were untrue when they were made.

86.     Drs. Cartledge and Lee made these untrue statements to induce Mark and Daun to invest in Cannula.

87.     Drs Cartledge and Lee knew at the time that the statements were made that they were untrue and that they were material statements about Cannula.

88.     Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

89.     Dr. Cartledge prescribed medication to make Mark amenable to the pressure to invest.

90.     Drs. Cartledge and Lee caused Cannula to issue stock in a company in which Mark and Daun invested.

91.     Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee in violation of 15 U.S.C. § 78j(b) and N.J.S.A. § 49:3-46 *et seq.*

**WHEREFORE,** plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Two
## Breach of Contract

92.     Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 91, as if set forth in full herein.

13

93.     Mark and Daun signed a Subscription Agreement to invest in Cannula.

94.     The Subscription Agreement provides for termination by the Investor "if any material representation or warranty of the Issuer shall have become untrue in any material respect . . . ."

95.     Mark and Daun paid money to Drs. Cartledge and Lee as required by the subscription agreement to invest in Cannula.

96.     Mark and Daun sought a stock certification for the share of Cannula from Drs. Cartledge and Lee.

97.     Mark and Daun have sought information about Cannula from Drs. Cartledge and Lee about cost projections and new developments which requests have been disregarded and denied.

98.     Drs. Cartledge and Lees refused to provide a stock certificate for Cannula until after Mark and Daun set a termination letter to them with respect to the investment.

99.     Drs. Cartledge and Lee and Cannula have breached their agreements with Mark and Daun, including the Subscription Agreement.

100.     Mark and Daun have been damaged by the breaches of Drs. Cartledge and Lee and Cannula of their agreements.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

LV1 288553v2 11/10/04

**Count Three**
**Breach of Covenant of Good Faith And Fair Dealing**

101.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 100, as if set forth in full herein.

102.    Inherent in every contract is an obligation of good faith and fair dealing.

103.    Mark and Daun signed a Subscription Agreement to invest in Cannula.

104.    Mark and Daun paid money to Drs. Cartledge and Lee as required by the Subscription Agreement.

105.    Mark and Daun sought a stock certification for the share of Cannula from Drs. Cartledge and Lee.

106.    Mark and Daun have sought information about Cannula from Drs. Cartledge and Lee about cost projections and new developments which requests have been disregarded and denied.

107.    Drs. Cartledge and Lee refused to provide a stock certificate for Cannula until after Mark and Daun set a termination letter to them with respect to the investment.

108.    Drs. Cartledge and Lee have breached the covenant by denying Mark and Daun the benefit of their agreement.

109.    Mark and Daun have been damaged by the breaches of Drs. Cartledge and Lee.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages,

LV1 288553v2 11/10/04

attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Four
## Unjust Enrichment/Restitution

110.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 109, as if set forth in full herein.

111.   Mark and Daun have paid investment money for Cannula to Drs. Cartledge and Lee.

112.   Drs. Cartledge and Lee made various promises to Mark and Daun regarding Cannula and providing information to them about the

113.   Drs. Cartledge and Lee and Cannula have failed to fulfill promises and representations made about Cannula and have provided no information regarding Cannula to Mark and Daun.

114.   Mark and Daun have terminated their agreement to invest in Cannula by letter dated March 28, 2003.

115.   Drs. Cartledge and Lee failed to deliver stock certificates for Cannula for almost six months after Mark and Daun paid their investment, despite demand for a stock certificate until after Mark and Daun terminated their investment.

116.   It would be unfair for Drs. Cartledge and Lee to be allowed to keep mark and Daun's money under these circumstances.

117.   Drs. Cartledge and Lee should have to return Mark and Daun's investment in Cannula or make restitution to them on account of it.

118.   Mark and Daun have been damaged by Drs. Cartledge and Lee's retention of their investment and refusal to return it to them.

16

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Five
## Negligent Misrepresentation

119.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 118, as if set forth in full herein.

120.    Drs. Cartledge and Lee are issuers of stock in a company in which Mark and Daun invested.

121.    Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun.

122.    Drs. Cartledge and Lee made these statements to induce Mark and Daun to invest in Cannula.

123.    Drs. Cartledge and Lee were recklessly unaware about whether the statements that they made about Cannula were true or not or wantonly disregarded whether the statements were true or not.

124.    Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

125.    Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee.

LV1 288553v2 11/10/04

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Six
## Fraud

126.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 125, as if set forth in full herein.

127.   Drs. Cartledge and Lee are issuers of stock in a company in which Mark and Daun invested.

128.   Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun that were untrue when they were made.

129.   Drs. Cartledge and Lee made these untrue statements to induce Mark and Daun to invest in Cannula.

130.   Drs. Cartledge and Lee knew at the time that the statements were made that they were untrue and that they were material statements about funding deals for Cannula and significant developments regarding the product.

131.   Drs. Cartledge and Lee recklessly disregarded the truth when they made statements to Mark and Daun about Cannula.

132.   Drs. Cartledge and Lee's conduct was willful, wanton, egregious and outrageous and it warrants the imposition of punitive damages.

133.   Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

134.   Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

### Count Seven
### Professional Negligence

135.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 134, as if set forth in full herein.

136.   Dr. Cartledge treated Mark following his heart surgery as a physician, including prescribing prescription pain killers and narcotics, including, for example, Percocet, Endocet and Ultram.

137.   Dr. Cartledge prescribed amounts of prescription medication for Mark in excess of that customarily and usually prescribed, even for recent post operative heart patients.

138.   Dr. Cartledge continued to prescribe prescription medications, including pain killers and narcotics even after he was aware that Mark's cardiologist, Dr. Montgomery was also prescribing similar medications.

LV1 288553v2 11/10/04

139.   Dr. Cartledge prescribed prescription medications and pain killers even over the objections of Mark's wife, based on Mark's deteriorating mental state.

140.   Dr. Cartledge prescribed excessive prescription medications to facilitate obtaining investment money from Mark.

141.   Mark was damaged by the excess prescription medication which Dr. Cartledge prescribed for him pain killers.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendant Richard Cartledge, M.D. for compensatory damages, consequential damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this court deems just and equitable.

### Count Eight
### Breach of Fiduciary Duty

142.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 141, as if set forth in full herein.

143.   Drs. Cartledge and Lee treated Mark as doctors in whom was reposed Mark total trust and confidence regarding his health and well-being.

144.   All through the relevant period, Dr. Cartledge was prescribing pain medication and pain killers which affected Mark's emotional well-being and ability to think clearly.

145.   During this time period, Drs. Cartledge and Lee also solicited and obtained investment money from Mark for Cannula.

146.   Drs. Cartledge and Lee owed Mark a fiduciary duty based upon their relationship as his trusted surgeons when he was very ill.

20

147.   Drs. Cartledge and Lee breached this duty by using their special relationship with Mark to obtain investment funds from him by fraud.

148.   Drs. Cartledge and Lee's conduct was willful, wanton, egregious and outrageous and it warrants the imposition of punitive damages.

149.   Mark has been damaged by the breach of fiduciary duty by Drs. Cartledge and Lee because they have refused to return his investment to him.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D. and Leonard Y. Lee, M.D. for compensatory damages, consequential, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

### Count Nine
### Conversion

150.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 149 as if set forth in full herein.

151.   Drs. Cartledge and Lee obtained Mark and Daun's property, specifically their investment in Cannula, through fraud.

152.   Mark and Daun terminated their investment in Cannula by letter dated March 28, 2003 and demanded the return of their investment money.

153.   Drs. Cartledge and Lee and Cannula are retaining possession of Mark and Daun's property without permission, specifically their investment in Cannula.

154.   Drs. Cartledge and Lee and Cannula have wrongfully refused to return Mark and Daun's property despite repeated proper demand for it.

155.   Mark and Daun are damaged by the continued deprivation of their property without their permission.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Ten
## Negligent Failure To Supervise

156.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 155, as if set forth in full herein.

157.   WMC owes patients a duty to supervise the performance of doctors that work in its fellowship programs treating patients with serious heart conditions.

158.   NYPH owed its patients a duty to supervise the performance of doctors that work for it treating patients with serious heart conditions.  Mark was identified as a "VIP" upon being admitted to NYPH for surgery.

159.   Drs. Cartledge and Lee were both employed by NYPH.

160.   While he was treating Mark, Dr. Cartledge was a fellow in a fellowship program sponsored and administered by WMC.

161.   Neither NYPH nor WMC detected that Dr. Cartledge over-prescribed prescription pain killers to Mark, including percocet, endocet and ultram.

162.   Neither NYPH nor WMC detected that Drs. Cartledge and Lee misused their positions as treating doctors to obtain investment money from Mark, especially relying on Mark's debilitated mental state from the over-prescription of pain killers..

22

163.    Neither NYPH nor the Medical College took any action to prevent Drs. Cartledge and Lee from pressuring Mark and Daun to make an investment in a business by fraud.

164.    Neither NYPH nor WMC took action to prevent Drs. Cartledge nor Lee from using Mark's identification as a "VIP" patient as a target for their fraudulent investment schemes.

165.    Mark has been damaged by the breach in the duty owed to him by NYPH and WMC.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendants Weill Medical College of Cornell University and New York-Presbyterian Hospital for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this court deems just and equitable.

### JURY DEMAND

Plaintiffs demands a trial by jury as to all issues so triable.

FOX ROTHSCHILD LLP
Attorneys for Plaintiffs Mark Imperatore
And Daun Imperatore

Frank Derby

Frank E. Derby (FD 2190)
Thomas R. Hower (TH 3793)
997 Lenox Drive, Building Three
Lawrenceville, NJ  08648-2311
(609) 896-3600 – Telephone
(609) 896-1469 – Facsimile

November _10_ , 2004

23