# EXHIBIT B

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is entered into as of the date set forth on the signature page hereof by and among Advanced Cannula, Inc., a Nevada corporation (together with its successors and permitted assigns, the "Issuer"), and the undersigned investor (together with its successors and permitted assigns, the "Investor"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section 8.1.

### RECITALS

The Issuer is offering to the Investor and other persons who qualify as Accredited Investors that number of shares of Common Stock the sale of which at the Purchase Price will result in proceeds to the Issuer of $200,000.00(the "Offering"). Subject to the terms and conditions of this Agreement, the Investor desires to subscribe for and purchase, and the Issuer desires to sell to the Investor, the shares of Common Stock at the Purchase Price, and on the other terms and conditions set forth in this Agreement.

### TERMS OF AGREEMENT

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

### ARTICLE I
### SUBSCRIPTION FOR AND ISSUANCE OF UNITS
### RESTRICTIONS ON TRANSFER

**1.1** **Subscription for Common Stock; Issuance of Common Stock.** Subject to the terms and conditions of this Agreement, the Investor hereby irrevocably subscribes for and agrees to purchase the shares of Common Stock from the Issuer for the Purchase Price set forth on the signature page hereof. The Investor acknowledges that the Issuer may, in its sole and absolute discretion, reduce the Investor's subscription for shares of Common Stock to any number of shares of Common Stock that does not exceed the number of shares of Common Stock set forth on the signature page hereof or that the Issuer may reject the Investor's subscription in its entirety, in each case without prior notice to or consent by the Investor. Upon acceptance of the Investor's subscription for shares of Common Stock, the Issuer shall sell the shares of Common Stock to the Investor for the Purchase Price, subject to the terms and conditions of this Agreement.

**1.2** **Legend.** Each certificate representing the shares of Common Stock shall bear the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF BY THE HOLDER EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND

IN COMPLIANCE WITH APPLICABLE SECURITIES LAWS OF ANY STATE WITH RESPECT THERETO OR IN ACCORDANCE WITH AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER THAT AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND ALSO MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH ANY APPLICABLE RULES OF THE SECURITIES AND EXCHANGE COMMISSION.

**1.3** **Notice of Proposed Transfer.** Prior to any transfer of any shares of Restricted Common Stock, the Holder of such Restricted Common Stock shall give five days' notice to the Issuer of such Holder's intention to effect such transfer (a "Transfer Notice"). Each Holder agrees that it will not sell, transfer or otherwise dispose of any shares of Restricted Common Stock, in whole or in part, except pursuant to an effective registration statement under the Securities Act or an exemption from registration thereunder. Each certificate, if any, evidencing such shares of Restricted Common Stock issued upon such transfer shall bear the restrictive legend set forth in Section 1.2 unless the opinion of the transferee's or Holder's counsel that such legend is not required in order to ensure compliance with the Securities Act is delivered to the Issuer in connection with such transfer. Such opinion shall be delivered with the Transfer Notice and shall be reasonably satisfactory to the Issuer.

**1.4** **Termination of Restrictions.** The restrictions imposed by this Article I upon the transferability of the Restricted Common Stock and the legend requirement of Section 1.2 shall terminate as to any particular share of Restricted Common Stock (i) when and so long as such security shall have been sold pursuant to an effective Registration Statement under the Securities Act and disposed of pursuant thereto, or (ii) when the Holder thereof shall have delivered to the Issuer the written opinion of counsel to such Holder, which opinion shall be reasonably satisfactory to the Issuer, stating that such legend is not required in order to ensure compliance with the Securities Act. Whenever the restrictions imposed by this Article I shall terminate as to any Restricted Common Stock, as herein provided, the Holder thereof shall be entitled to receive from the Issuer, at the expense of the Issuer, a new certificate representing such Common Stock not bearing the restrictive legend set forth in Section 1.2.

## ARTICLE II
## CLOSING

**2.1** **Closing.** The closing of the purchase and sale of the Shares of Common Stock as contemplated herein (the "Closing") shall take place at 10:00 A.M. on November ___, 2002, at The Law Offices of Mitchell Cantor, 470 Park Avenue South, 12th Floor, New York, NY 10016 or at such other time, place, and date as the Issuer and all purchasers of shares of Common Stock (including the Investor) shall agree. At the Closing, unless the Investor and the Issuer otherwise agree (i) the Investor shall pay $200,000., with credit given to Investor for any and all moneys previously tendered (which amount shall be hereinafter referred to as the "Purchase Price") to the Issuer (A) by wire transfer of immediately available funds to such account as the Issuer shall

designate in writing or (B) by delivery of a certified or bank check payable as Issuer shall designate in writing, in either such case in an amount equal to the Total Purchase Price; (ii) the Issuer shall issue the shares of Common Stock to the Investor and shall cause to be delivered to the Investor certificates representing the shares of Common Stock duly registered in the name of the Investor; and (iii) all other agreements and documents referred to in this Agreement which are required for the Closing shall be executed and delivered (if that is not done prior to the Closing).

**2.2** **Purchase Price**. The purchase price for each share of Common Stock (the "Common Stock Purchase Price") shall be $20.00.00 for a total of 10,000 shares.

**2.3** **Termination.** After the Issuer's acceptance of the Investor's subscription, this Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of the Issuer and the Investor;

(b) by the Investor, upon a breach of any material representation, warranty, covenant or agreement on the part of the Issuer set forth in this Agreement, or if any material representation or warranty of the Issuer shall have become untrue in any material respect, in either case such that the conditions in Section 7.1 would be incapable of being satisfied by the Closing Date; and

(c) by the Issuer, upon a breach of any material representation, warranty, covenant or agreement on the part of the Investor set forth in this Agreement, or if any material representation or warranty of the Investor shall have become untrue in any material respect, in either case such that the conditions in Section 7.2 would be incapable of being satisfied by the Closing Date.

**2.4** **Effect of Termination.** In the event of termination of this Agreement pursuant to Section 2.3, this Agreement shall forthwith become void, there shall be no liability on the part of the Issuer or the Investor to each other and all rights and obligations of any party hereto shall cease; provided, however, that nothing herein shall relieve any party from liability for the willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE ISSUER

The Issuer represents and warrants to the Investor as follows:

**3.1** **Corporate Status.** The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada  The Issuer has no Subsidiaries.

**3.2** **Power and Authority.** The Issuer has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transactions contemplated hereby. The Issuer has taken all necessary corporate action to authorize

the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**3.3** **Enforceability.** This Agreement has been duly executed and delivered by the Issuer and constitutes a legal, valid and binding obligation of the Issuer, enforceable against the Issuer in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

**3.4** **No Violation**. The execution and delivery by the Issuer of this Agreement, the consummation of the transactions contemplated hereby, and the compliance by the Issuer with the terms and provisions hereof (including, without limitation, the Issuer's issuance to the Investor of the shares of Common Stock contemplated by and in accordance with this Agreement), will not result in a default under (or give any other party the right, with the giving of notice or the passage of time (or both), to declare a default or accelerate any obligation under) or violate the Certificate of Incorporation or By-laws of the Issuer or any material contract to which the Issuer is a party (except to the extent such a default would not, in the case of a contract, have a Material Adverse Effect on the Issuer), or any Requirement of Law applicable to the Issuer, or result in the creation or imposition of any material Lien upon any of the capital stock, properties or assets of the Issuer (except where such Lien would not have a Material Adverse Effect on the Issuer). No consents, filings, authorizations or other actions of any Governmental Authority are required for the Issuer=s execution, delivery and performance of this Agreement, other than filings required under the Securities Act and the Rules and Regulations thereunder and applicable state securities laws. No consent, approval, waiver or other action by any Person under any Contract to which the Issuer is a party or by which the Issuer or any of its properties or assets are bound is required or necessary for the execution, delivery or performance by the Issuer of this Agreement and the consummation of the transactions contemplated hereby, except where the failure to obtain such consents would not have a Material Adverse Effect on Issuer.

**3.5** **Capitalization**. The authorized capital stock of the Issuer consists of 100,000 shares of Common Stock of which 40,000 shares were issued and outstanding as of this date, with 20,000 thereof owned by Leonard Lee, M.D. and an additional 20,000 owned by Richard Cartledge, M.D. There are (A) no rights, options, warrants, convertible securities, subscription rights or other agreements, calls, plans, contracts or commitments of any kind relating to the issued and unissued capital stock of, or other equity interest in, the Issuer outstanding or authorized and (B) no contractual obligations of the Issuer to purchase, redeem or otherwise acquire any shares of Common Stock.

**3.6.** **Valid Issuance.** Upon payment of the Purchase Price by the Investor and delivery by the Issuer to the Investor of certificates representing the shares of Common Stock in accordance with Section 2.1, the shares of Common Stock will be validly issued, fully paid and non-assessable, free and clear of all Liens (other than restrictions on transfer imposed by this Agreement, the Securities Act and applicable state securities laws).

**3.7** **Governing Documents**. The Issuer has delivered or made available to the Investor true, accurate and complete copies of the Issuer's Certificate of Incorporation and By-laws in effect as of the date hereof.

**3.8** **Material Changes.** Except as otherwise disclosed to the Investor in writing or as otherwise contemplated herein, since May 23, 2002 there has been no Material Adverse Change in the Issuer.

**3.9** **Commissions and Consulting Fees**. The Issuer has not incurred any obligation for any finder's or broker's or agent's fees or commissions in connection with the transactions contemplated hereby.

**3.10** **Use of Proceeds.** The proceeds of the Offering, net of payment of fees and other expenses of the Offering, will be used by Issuer for the purposes described on Schedule 3.10 hereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF INVESTOR

Investor represents and warrants to the Issuer as follows:

**4.1** **Status, Power and Authority.** The Investor, if other than a natural person, is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation. The Investor has the corporate, partnership or other power and authority under applicable law to execute and deliver this Agreement and consummate the transactions contemplated hereby, and has all necessary authority to execute, deliver and perform its obligations under this Agreement and consummate the transactions contemplated hereby. The Investor has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby. The Investor, if a natural person, is an individual residing at that location set forth on the signature page hereof, with competence and authority under applicable law to execute and deliver, and to perform the Investor's obligations under, this Agreement and consummate the transactions contemplated hereby.

**4.2** **Enforceability.** This Agreement has been duly executed and delivered by the Investor and constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor=s rights generally and general equitable principles regardless of whether enforceability is considered in a proceeding at law or in equity.

**4.3** **No Violation.** The execution and delivery by the Investor of this Agreement, the consummation of the transactions contemplated hereby, and the compliance by the Investor with the terms and provisions hereof, will not result in a default under (or give any other party the right, with the giving of notice or the passage of time (or both), to declare a default or accelerate any obligation

under) or violate any charter or similar documents of the Investor, if other than a natural person, or any Contract to which the Investor is a party or by which it or any of its properties or assets are bound, or violate any Requirement of Law applicable to the Investor, other than such violations or defaults which, individually and in the aggregate do not and will not have a Material Adverse Effect on the Investor. The Investor is familiar with Regulation M promulgated under the Exchange Act, a copy of which is attached hereto as Exhibit 4.3, and is in full compliance with the provisions thereof with respect to the transactions contemplated hereby.

**4.4** **Consents/Approvals.** No consents, filings, authorizations or actions of any Governmental Authority are required for the Investor's execution, delivery and performance of this Agreement. No consent, approval, waiver or other action by any Person under any Contract to which the Investor is a party or by which the Investor or any of its properties or assets are bound is required or necessary for the execution, delivery and performance by the Investor of this Agreement and the consummation of the transactions contemplated hereby.

**4.5** **Investment Intent.** The Investor is acquiring the shares of Common Stock for its own account and with no present intention of distributing or selling such shares of Common Stock, and no one other than the Investor has any beneficial interest in such shares of Common Stock. Investor understands that the offer and sale by the Issuer of the shares of Common Stock being acquired by the Investor hereunder have not been registered under the Securities Act by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements of the Securities Act pursuant to Section 4(2) thereof and the Rules and Regulations promulgated thereunder, and that the reliance of the Issuer on such exemption from registration is predicated in part on the representations and warranties of the Investor set forth herein. The Investor acknowledges that pursuant to Section 1.2 of this Agreement, a restrictive legend consistent with the foregoing has been or will be placed on the certificates representing the shares that constitute a part of the shares of Common Stock.

**4.6** **Accredited Investor.** The Investor is an "Accredited Investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act (a copy of which is attached hereto as Exhibit 4.6), and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment to be made by it hereunder.

**4.7** **Adequate Information.** The Investor has received from the Issuer, and has reviewed, such information as the Investor considers necessary or appropriate to evaluate the risks and merits of an investment in the shares of Common Stock, including without limitation, the Issuer's Business Plan and the risk factors relating to an investment in securities of the Issuer attached hereto as Exhibit 4.12.

**4.8** **Opportunity to Question.** The Investor has had the opportunity to question and has questioned, to the extent deemed necessary or appropriate, representatives of the Issuer so as to receive answers and verify information obtained in the Investor's examination of the Issuer, including the information that the Investor has received and reviewed as referenced in Section 4.7 hereof in relation to its investment in the shares of Common Stock.

**4.9** **No Other Representations.** No oral or written representations have been made to the Investor in connection with the Investor's acquisition of the shares of Common Stock that were in any way inconsistent with the information reviewed by the Investor. The Investor acknowledges that no representations or warranties of any type or description have been made to it by any Person with regard to the Issuer, any of their respective businesses, properties or prospects or the investment contemplated herein, other than the representations and warranties set forth in Article III hereof.

**4.10** **Knowledge and Experience.** The Investor, individually and/or together with its professional advisors, has such knowledge and experience in financial, tax and business matters, including substantial experience in evaluating and investing in common stock and other securities (including the common stock and other securities of new and speculative companies), so as to enable the Investor to use the information referred to in Section 4.7 hereof and any other information made available by the Issuer to the Investor in order to evaluate the merits and risks of and investment in the shares of Common Stock and to make an informed investment decision with respect thereto.

**4.11** **Independent Decision.** The Investor is not relying on the Issuer or on any legal or other opinion in the materials reviewed by the Investor with respect to the financial or tax considerations of the Investor relating to its investment in the shares of Common Stock. The Investor has relied solely on the representations, warranties, covenants and agreements of the Issuer in this Agreement (including the Exhibits and Schedules hereto) and on its examination and independent investigation in making its decision to acquire the shares of Common Stock.

**4.12** **Risk Factors.** The Investor recognizes that an investment in the shares of Common Stock involves substantial risks, including loss of the entire amount of such investment. Further, the Investor has carefully read and considered the matters set forth as "Risk Factors" in Exhibit 4.12 and has taken full cognizance of and understands all of the risks related to the purchase of the shares of Common Stock.

**4.13** **No Advertising, etc.** The Investor is not subscribing for the shares of Common Stock as a result of, or pursuant to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or meeting.

**4.14** **Financial Means.** If the Investor is a natural person, the Investor has reached the age of majority in the state in which he or she resides, has adequate means of providing for his or her current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the shares of Common Stock for an indefinite period of time, has no need for liquidity in such investment, and at the present time could afford a complete loss of such investment.

**4.15** **No Commissions.** The Investor has not incurred any obligation for any finder's or broker's or agent's fees or commissions in connection with the transactions contemplated hereby.

## ARTICLE V
## COVENANTS

5.1   **Public Announcements.** The Investor agrees not to make any public announcement or issue any press release or otherwise publicly disseminate any information about the subject matter of this Agreement. The Issuer shall have the right to make such public announcements and shall control, in its sole and absolute discretion, the timing, form and content of all press releases or other public communications of any sort relating to the subject matter of this Agreement, and the method of their release or publication thereof.

5.2   **Further Assurances.** Each party shall execute and deliver such additional instruments and other documents and shall take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the transactions contemplated hereby. Each of the Investor and the Issuer shall make on a prompt and timely basis all governmental or regulatory notifications and filings required to be made by it with or to any Governmental Authority in connection with the consummation of the transactions contemplated hereby. The Issuer and the Investor each agree to cooperate with the other in the preparation and filing of all forms, notifications, reports and information, if any, required or reasonably deemed advisable pursuant to any Requirement of Law in connection with the transactions contemplated by this Agreement and to use their respective best efforts to agree on a method to overcome any objections by any Governmental Authority to any such transactions. Except as may be specifically required hereunder, neither of the parties hereto, or their respective Affiliates shall be required to agree to take any action that in the reasonable opinion of such party would result in or produce a Material Adverse Effect on such party. The parties also agree to use best efforts to defend all lawsuits or other legal proceedings challenging this Agreement or the consummation of the transactions contemplated hereby and to lift or rescind any injunction or restraining order or other order adversely affecting the ability of the parties to consummate the transactions contemplated hereby.

5.3   **Notification of Certain Matters.** Each party hereto shall give prompt notice to the other party of the occurrence, or non-occurrence, of any event which would be likely to cause any representation or warranty herein to be untrue or inaccurate, or any covenant, condition or agreement herein not to be complied with or satisfied.

5.4   **Resale of the Shares of Common Stock.** The Investor agrees not to transfer the shares of Common Stock in violation of the Securities Act or any applicable state securities laws and that it will not sell or otherwise dispose of any of the shares of Common Stock unless such sale or other disposition has been registered under the Securities Act or, in the opinion of counsel reasonably satisfactory to the Issuer, is exempt from registration under the Securities Act and has been registered or qualified or, in the opinion of such counsel, is exempt from registration or qualification under applicable state securities laws.

## ARTICLE VI
## INDEMNIFICATION

6.1     **Indemnification Generally**. The Issuer, on the one hand, and the Investor, on the other hand (each an "Indemnifying Party" as further defined in Section 6.2), shall indemnify the other from and against any and all losses, damages, liabilities, claims, charges, actions, proceedings, demands, judgments, settlement costs and expenses of any nature whatsoever (including, without limitation, attorneys' fees and expenses) or deficiencies resulting from any breach by the Indemnifying Party of a representation, warranty or covenant set forth in this Agreement and all claims, charges, actions or proceedings incident to or arising out of the foregoing.

6.2     **Indemnification Procedures**. Each Person entitled to indemnification under this Section (an "Indemnified Party") shall give notice as promptly as reasonably practicable to each party required to provide indemnification under this Section (an "Indemnifying Party") of any action commenced against or by it in respect of which indemnity may be sought hereunder, but failure to so notify an Indemnifying Party shall not relieve such Indemnifying Party from its liability hereunder or any liability that it may have otherwise than on account of this indemnity agreement, so long as such failure shall not have materially prejudiced the position of the Indemnifying Party. Upon such notification, the Indemnifying Party shall assume the defense of such action if it is a claim brought by a third party and after such assumption the Indemnifying Party shall not be entitled to reimbursement of any expenses incurred by it in connection with such action except as described below. In any such action, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the contrary or (ii) the named parties in any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing or conflicting interests between them. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent (which shall not be unreasonably withheld or delayed by such Indemnifying Party), but if settled with such consent or if there be final judgment for the plaintiff, the Indemnifying Party shall indemnify the Indemnified Party from and against any loss, damage or liability by reason of such settlement or judgment.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     **Conditions to the Obligations of the Investor**. The obligation of Investor to proceed with the Closing is subject to the following conditions any and all of which may be waived, in whole or in part, to the extent permitted by applicable law:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of the Issuer contained in this Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (i) for changes specifically permitted by this Agreement, and (ii) that those representations and warranties which address matters only as of a particular date shall remain true and correct as of such date, except in any case for such failures to be true and correct which would not, individually or in the aggregate, have a Material Adverse Effect on the Issuer. The Investor or its counsel shall have received a certificate of an executive officer of the Issuer to such effect.

(b) <u>Agreement and Covenants</u>. The Issuer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date. The Investor or its counsel shall have received a certificate of an executive officer of the Issuer to such effect.

(c) <u>No Order</u>. No governmental authority or other agency or commission or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, injunction, or other order (whether temporary, preliminary or permanent) which is in effect and which materially restricts, prevents or prohibits consummation of the Closing or any transaction contemplated by this Agreement; <u>provided</u>, <u>however</u>, <u>that</u> the parties hereto shall use their reasonable best efforts to cause any such decree, judgment, injunction, or other order to be vacated or lifted.

7.2 **Conditions to the Obligations of the Issuer.** The obligation of the Issuer to proceed with the Closing is subject to the following conditions any and all of which may be waived, in whole or in part, to the extent permitted by applicable law:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of the Investor contained in this Agreement shall be true and correct as of the Closing Date as though made on and as of the Closing Date, except (i) for changes specifically permitted by this Agreement, and (ii) that those representations and warranties which address matters only as of a particular date shall remain true and correct as of such date, except in any case for such failures to be true and correct which would not, individually or in the aggregate, have a Material Adverse Effect on the Investor. Unless the Issuer receives written notification to the contrary at or before the Closing Date, the foregoing conditions shall be deemed to have been certified by the Investor in all respects as of the Closing Date.

(b) <u>Agreement and Covenants</u>. The Investor shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date. Unless the Issuer receives written notification to the contrary at the Closing Date, the foregoing conditions shall be deemed to have been certified by the Investor in all respects as of the Closing Date.

(c) <u>No Order</u>. No governmental authority or other agency or commission or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or

entered any statute, rule ,regulation, executive order, decree, injunction, or other order (whether temporary, preliminary or permanent) which is in effect and which materially restricts, prevents or prohibits consummation of the Closing or any transaction contemplated by this Agreement; provided, however, that the parties hereto shall use their reasonable best efforts to cause any such decree, judgment, injunction, or other order to be vacated or lifted.

## ARTICLE VIII
## MISCELLANEOUS

8.1 **Defined Terms.** As used herein the following terms shall have the following meanings:

"Accredited Investor" has the meaning set forth in Regulation D.

"Affiliate" shall have the meaning ascribed to it in Rule 12b-2 of the General Rules and Regulations under the Exchange Act, as in effect on the date hereof.

"Certificate of Incorporation" means the Issuer's Certificate of Incorporation as the same may be supplemented, amended or restated from time to time.

"Closing" has the meaning set forth in Article II of this Agreement.

"Closing Date" means the date designated for the Closing pursuant to Section 2.1.

"Common Stock" means the Issuer's Common Stock, $.001 par value.

"Common Stock Purchase Price" has the meaning set forth in Section 2.2.

"Contract" means any indenture, lease, sublease, loan agreement, mortgage, note, restriction, commitment, obligation or other contract, agreement or instrument.

"Controlling Person" means any Person who controls (within the meaning of the Securities Act) the Issuer.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any entity or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Holder" means the Investor and each other permitted transferee of Shares, Warrants or Warrant Shares.

"Investor" has the meaning set forth in the Recitals to this Agreement.

"Issuer" has the meaning set forth in the Recitals to this Agreement.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable law in any jurisdiction in connection with such mortgage, pledge, security interest, encumbrance, lien or charge.)

"Material Adverse Change" or "Material Adverse Effect" means a change or effect in the condition (financial or otherwise), properties, assets, liabilities, rights, obligations, operations, or business of the Issuer, which change individually or in the aggregate, is materially adverse to such condition, properties, assets, liabilities, rights, obligations, operations, or business of the Issuer.

"Offering" has the meaning set forth in the Recitals to this Agreement.

"Person" means an individual, partnership, corporation, business trust, joint stock company, estate, trust, unincorporated association, joint venture, Governmental Authority or other entity, of whatever nature.

"Purchase Price" has the meaning set forth in Section 2.1 hereof.

"Regulation D" means Regulation D promulgated under the Securities Act, as such regulation may be modified or amended from time to time.

"Requirements of Law" means as to any Person, the articles of incorporation, by-laws or other organizational or governing documents of such person, and any domestic or foreign and federal, state or local law, rule, regulation, statute or ordinance or determination of any arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its properties is subject.

"Restricted Common Stock" means shares of a Common Stock evidenced by a certificate bearing the restrictive legend set forth in Section 1.2 hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" means as to any Person, a corporation of which more than 50% of the outstanding capital stock having full voting power is at the time directly or indirectly owned or controlled by such Person.

**8.2** **Other Definitional Provisions.**

(a) All terms defined in this Agreement shall have the defined meanings when used in any certificates, reports or other documents made or delivered pursuant hereto or thereto, unless the context otherwise requires.

(b) Terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

(c) All accounting terms shall have a meaning determined in accordance with GAAP.

(d) As used herein, the neuter gender shall also denote the masculine and feminine, and the masculine gender shall also denote the neuter and feminine, where the context so permits.

(e) The words "hereof", "herein" and "hereunder", and words of similar import, when used in this Agreement shall refer to this Agreement as a whole (including any Exhibits and Schedules hereto) and not to any particular provision of this Agreement.

**8.3** **Notices.** All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be delivered by certified or registered mail (first class postage pre-paid), guaranteed overnight delivery, or facsimile transmission if such transmission is confirmed by delivery by certified or registered mail (first class postage pre-paid) or guaranteed overnight delivery, to the following addresses and telecopy numbers (or to such other addresses or telecopy numbers which such party shall subsequently designate in writing to the other party):

(a) if to the Issuer to:

Advanced Cannula Inc.
435 East 70th Street, Apt 12-L
New York, NY 10021
Attention: Leonard Lee, M.D.
Telecopy: (212) _____
with a copy to:

The Law Offices of Mitchell Cantor
470 Park Avenue South, 12th floor
New York, NY 10016
Attention: Mitchell Cantor, Esq.
Telecopy (212) 686-3822

(b) if to Investor to the address set forth next to its name on the signature page hereto.

**8.4** **Remedies**.

(a) Each of the Investor and the Issuer acknowledges that the other party would not have an adequate remedy at law for money damages in the event that any of the covenants or agreements of such party in this Agreement was not performed in accordance with its terms, and it is therefore agreed that each of the Investor and the Issuer, in addition to and without limiting any other remedy or right such party may have, shall have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach and enforcing specifically the terms and provisions hereof, and each of the Investor and the Issuer hereby waives any and all defenses such party may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief.

(b) All rights, powers and remedies under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

**8.5** **Entire Agreement.** This Agreement (including the Exhibits and Schedules attached hereto) and other documents delivered at the Closing pursuant hereto contain the entire understanding of the parties in respect of its subject matter and supersede all prior agreements and understandings between or among the parties with respect to such subject matter. The Exhibits and Schedules constitute a part hereof as though set forth in full above.

**8.6** **Expenses; Taxes.** Except as otherwise provided in this Agreement, the parties shall pay their own fees and expenses, including their own counsel fees, incurred in connection with this Agreement or any transaction contemplated hereby. Any sales, stamp duty, deed transfer or other tax (except taxes based on the income of the Investor) arising out of the issuance of the shares of Common Stock by the Issuer to the Investor and the consummation of the transactions contemplated by this Agreement shall be paid by the Issuer.

**8.7** **Amendment; Waiver.** This Agreement may not be modified, amended, supplemented, canceled or discharged, except by written instrument executed by both parties. No failure to exercise, and no delay in exercising, any right, power or privilege under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege hereunder preclude the exercise of any other right, power or privilege. No waiver of any breach of any provision shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision, nor shall any waiver be implied from any course of dealing between the parties. No extension of time for performance of any obligations or other acts hereunder or under any other agreement shall be deemed to be an extension of the time for performance of any other obligations or any other acts. The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or equity, that they may have against each other.

**8.8    Binding Effect; Assignment.** The rights and obligations of this Agreement shall bind and inure to the benefit of the parties and their respective successors and legal assigns. The rights and obligations of this Agreement may not be assigned by any party without the prior written consent of the other party.

**8.9    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

**8.10    Headings.** The headings contained in this Agreement are for convenience of reference only and are not to be given any legal effect and shall not affect the meaning or interpretation of this Agreement.

**8.11    Governing Law; Interpretation.** This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of New York applicable to contracts executed and to be wholly performed within such State.

**8.12    Severability.** The parties stipulate that the terms and provisions of this Agreement are fair and reasonable as of the date of this Agreement. However, if provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. If, moreover, any of those provisions shall for any reason be determined by a court of competent jurisdiction to be unenforceable because excessively broad or vague as to duration, activity or subject, it shall be construed by limiting, reducing or defining it, so as to be enforceable.

**8.13    Limitation of Trustee, Officer and Shareholder Liability.** The following shall apply to the undersigned only if the undersigned is a series of a Massachusetts business trust (the "Trust"): The Issuer hereby acknowledges that this Agreement and any agreements, documents, and instruments executed in connection herewith (collectively, the "Documents") relate solely to the undersigned and not to any other series of the Trust. The Issuer hereby agrees that, in seeking to enforce any of its rights under any of the Documents it will look solely to the undersigned, and not to any other series of the Trust, and that all such other series shall have no liabilities or obligations under the Documents. Additionally, notice is hereby given that the Documents are executed on behalf of the trustees of the Trust as trustees and not individually, and that the obligations set forth in the Documents are not binding upon any of the trustees, officers or shareholders of the Trust individually, but are binding only upon the assets and property of the undersigned Trust.

## SIGNATURE PAGE

**IN WITNESS WHEREOF**, the parties hereto have caused this Subscription Agreement to be duly executed and delivered as of the date set forth below.

MARK IMPERATORE and
DAUN IMPERATORE, BY THE ENTIRETIES

*[signatures]*

SIGNATURE:

By: Mark Imperatore

Printed Name: Mark Imperatore

Title:

ADDRESS FOR NOTICE (Please Print):

748 Galloping Hill Road
Franklin Lakes, NJ  07417

Attention:

Telecopy:

Tax Identification #:

Exact Name to appear on Stock Certificates: Mark and Daun Imperatore, by the Entireties

Number of Shares of Common Stock Subscribed For: 10,000 (representing a twenty percent interest in the Company)

Purchase Price (see Section 1.1):    $ 200,000.00

S-1

Investor hereby provides the following additional information:

(a) Excluding the shares of Common Stock subscribed for above, set forth below is the number of shares of Common Stock which Investor <u>beneficially owns</u> or of which Investor is the record owner on the date hereof. Please refer to the definition of <u>beneficial ownership</u> on <u>Exhibit S-1</u> attached hereto. If none, please so state.

Number of shares of
Common Stock: _____ (excluding the shares of Common Stock subscribed for above)

Please indicate by an asterisk (*) above if Investor disclaims "<u>beneficial ownership</u>" of any of the above listed Securities, and indicate in response to question (b) below who has beneficial ownership.

(b) If Investor disclaims "<u>beneficial ownership</u>" in question (a), please furnish the following information with respect to the person(s) other than Investor who is the beneficial owner(s) of the Securities in question. If not applicable, please check box:  G

      Name of Beneficial Owner:

      Relationship to Investor:

      Number of Securities Beneficially Owned:

      NAME OF INVESTOR:

(c) Are any of the shares of Common Stock listed in response to question (a) the subject of a voting agreement, contract or other arrangement whereby others have voting control over, or any other interest in, any of the Investor's Securities?

                        Yes        No

If the answer is "Yes", please give details:

(d) Please describe each position, office or other material relationship which Investor has had with the Issuer or any of its affiliates, including any Subsidiary of Issuer, within the past three years. Please include a description of any loans or other indebtedness, and any contracts or other arrangements or transactions involving a material amount, payable by the Investor to the Issuer or any of its affiliates, including its Subsidiaries, or by the Issuer or any of its affiliates, including its

Subsidiaries, to the Investor. "Affiliates" of the Issuer include its directors and executive officers, and any other person controlling or controlled by the Issuer. **If none, please so state**.

Answer:

(e)     Please provide the name and address of other person(s), if any, to whom any proxy statements, registration statements (including notice of effectiveness thereof), prospectuses or similar documents and information should be delivered by the Issuer on behalf of the Investor in the future, with respect to the Investor's shares:

_____

_____

_____

_____

(f)     Please advise of special stock certificate delivery requirements for Closing, if any:

ACCEPTED:
ADVANCED CANNULA, INC.

By: _____                    Dated:  11·2-02
Name: Leonard Lee, M.D.
Title: President

_____                         11/6/02
Richard G. Cartledge, M.D