THE LAW OFFICES OF MITCHELL CANTOR
By:  Mitchell Cantor, Esquire (MC 5401)
470 Park Avenue South, 12th Floor
New York, NY  10016
Tel. (212) 679-7820
Attorneys for Defendant Richard Cartledge, M.D.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X
                                                          :
MARK IMPERATORE AND DAUN                :
IMPERATORE,                                          :
                         Plaintiffs,                      :        Civil Action No. 04 CV 8921
                                                          :
         v.                                                 :
                                                          :        ANSWER WITH
LEONARD Y. LEE, M.D., RICHARD         :        AFFIRMATIVE DEFENSES
CARTLEDGE, M.D., ADVANCED CANNULA,  :        AND
INC., WEIL MEDICAL COLLEGE OF           :        COUNTERCLAIMS
CORNELL UNIVERSITY, NEW YORK-           :
PRESBYTERIAN HOSPITAL,                     :
                                                          :
                         Defendants.                   :
———————————————————————— X

         Defendant Richard Cartledge, M.D., (henceforth "Cartledge") by his attorneys

The Law Offices of Mitchell Cantor, answers the complaint as follows:

         1.  Defendant Cartledge lacks sufficient information to form a belief as to the

truth or falsity of the allegations set forth in paragraphs 1, 2, 3, 6, 7, 11, 12, 13, 14, 15,

16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 36, 40, 42, 52, 63, 67, 72, 74, 75, 77, 81

and 84 of the complaint.

         2.  Defendant Cartledge admits the allegations set forth in paragraphs 4, 5, 45, 60,

66, 70, 71, 93, 94, 103 and 160 of the complaint.

         3.  Defendant Cartledge denies the allegations set forth in paragraphs  17, 27, 31,

33, 34, 35, 37, 46, 47, 48, 49, 54, 55, 56, 58, 59, 64, 65, 69, 79, 82, 91, 95, 100, 104, 109,

111, 114, 115, 116, 117, 118, 120, 124, 125, 127, 133, 134, 137, 138, 139, 140, 141, 144, 146, 149, 151, 152, 153, 154, 155 and 165 of the complaint.

4.   Defendant Cartledge denies the allegations set forth in paragraphs 53, 62, 68, 73, 76, 78, 85, 86, 87, 88, 89, 90, 96, 97, 98, 99, 105, 106, 107, 108, 113, 121, 122, 123, 128, 129, 130, 131, 132, 143, 145, 147, 148 and 159 to the extent said allegations apply to Cartledge, and lacks sufficient information to form a belief as to the truth or falsity of the allegations set forth in paragraphs  53, 62, 68, 73, 76, 78, 85, 86, 87, 88, 89, 90, 96, 97, 98, 99, 105, 106, 107, 108, 113, 121, 122, 123, 128, 129, 130, 131, 132, 143, 145, 147, 148 and 159 to the extent that said allegations apply to other parties.

5.   The allegations set forth in paragraphs 8, 9, 10, 102, 157 and 158 state legal conclusions as to which no responsive pleading is required.

6.   Defendant Cartledge admits in part and denies in part the allegations set forth in paragraphs 32, 38, 39, 57 and 80 of the complaint.

7.   Defendant Cartledge admits in part the allegations set forth in paragraph 41 of the complaint only to the extent of admitting that he examined Mark in his apartment at Mark's request and on the representation by Mark that Mark was experiencing severe pain and was unable to obtain a timely appointment with Dr. Girardi.

8.   Defendant Cartledge admits the allegations set forth in paragraph 43 of the complaint in light of the fact that the information provided to Mark concerning Cannula was supplied to Mark at Mark's request.

9.   Defendant Cartledge admits the allegations set forth in paragraph 44 of the complaint to the extent that he dined with Mark, Daun and a female friend of theirs on or about January 19, 2002 at the invitation of Mark and Daun.   It was Cartledge's

understanding that the dinner was social in nature and that the purpose of the dinner was a "double date". It was only after meeting this female friend of Daun's that Cartledge learned that she was active in financing medical devices and it was only in response to her social conversation that Cartledge first discussed his inventions in the presence of Mark and Daun.

10. Defendant Cartledge admits the allegations set forth in paragraph 50 of the complaint only to the extent that he prescribed pain medication for Mark at Mark's request and denies all other allegations contained in this paragraph.

11. Defendant Cartledge denies the allegation in paragraph 51 of the complaint asserting that Mark's wife contacted Cartledge but lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations in this paragraph.

12. Defendant Cartledge admits the allegations set forth in paragraph 61 to the extent that he left on Sunday, 7, 2002, which was the date he had told Daun and Mark he was leaving and the date he was scheduled to leave.

13. Defendant Cartledge admits the allegations set forth in paragraph 136 of the complaint to the extent that Cartledge prescribed for Mark appropriate pain medication for a male of Mark's weight, which was over 300 pounds, who had just undergone major cardiac surgery and was complaining of severe pain.

14. Defendant Cartledge denies the allegations set forth in paragraph 161 to the extent it is alleged that Cartledge over-prescribed medication for Mark. Cartledge otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

15. Defendant Cartledge denies the allegations set forth in paragraph 162 to the extent that it is alleged that he misused his position as a treating doctor and relied upon Mark's allegedly debilitated mental state.   Cartledge otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

16. Defendant Cartledge denies the allegations set forth in paragraph 163 to the extent that it is alleged that he pressured Mark and Daun and defrauded them.   Cartledge otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

17. Defendant Cartledge denies the allegations set forth in paragraph 164 to the extent that it is alleged that he used Mark's identification as an alleged "VIP" as a target and further denies any participation in fraud.   Cartledge otherwise lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

18. The allegations set forth in paragraphs 112 and 143 are garbled, illogical, incomprehensible and cannot be answered.

19. Defendant Cartledge repeats his responses to the allegations set forth in paragraphs 83, 92, 101, 110, 119, 126, 135 , 142, 150 and 156 of the complaint.

<u>AS AND FOR A FIRST AFFIRMATIVE DEFENSE</u>

20. The complaint fails to state a claim.

<u>AS AND FOR A SECOND AFFIRMATIVE DEFENSE</u>

21. This action is barred by the Statute of Limitations.

<u>AS AND FOR A THIRD AFFIRMATIVE DEFENSE</u>

22.  Plaintiffs failed to exercise their rights in a timely manner so that this action is barred by the doctrine of laches.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

23.  Plaintiff Mark Imperatore at all relevant times herein solicited medication from Cartledge on the representation that he was experiencing severe pain and was unable to obtain timely appointments with Dr. Girardi.  At all relevant times herein, plaintiffs concealed from Cartledge the fact that Mark was obtaining medication from Drs. Montgomery and Girardi in order to obtain additional prescriptions from Cartledge. On information and belief, Mark Imperatore is a drug seeker.  In light of the foregoing, this action is barred by the doctrine of unclean hands.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

24.  Plaintiffs at all relevant times herein repeatedly represented to Cartledge that they were very wealthy individuals with extensive connections in the business and financial communities, that they had participated in numerous private placements, that they were well acquainted with the private placement process, and that Mark was a stockbroker.  In light of the foregoing, this action is barred by plaintiff's bad faith and by their fraud against Cartledge.

### AS AND FOR A FIRST COUNTERCLAIM-DEFAMATION

25.  Defendant Cartledge first became acquainted with plaintiffs when Mark was hospitalized at New York Presbyterian Hospital in December 2001.  Contrary to plaintiff's allegations,  Cartledge was not part of Mark's surgical team, did not assist in Mark's surgery and only treated him twice while Mark was in the hospital.  On one of those two occasions, Cartledge ordered a blood transfusion for Mark because Mark's

health appeared to be failing and Dr. Girardi, Mark's principal physician, was unavailable.    On information and belief, this impressed plaintiffs who subsequently sent Cartledge a gift basket to thank him after Mark left the hospital.

26.  Cartledge first contacted plaintiffs after receipt of the gift basket to thank them for thinking of him.  Plaintiffs thereupon invited Cartledge to dinner.  Plaintiffs also invited a female friend of the plaintiffs for what Cartledge understood to be a purely social occasion in the nature of a "double date".

27.  At dinner, Cartledge learned that the female friend worked with the financing of medical devices.  Cartledge then spoke for the first time in the presence of the plaintiffs of his inventions, primarily in response to social questions posed by his dinner companion for the evening.

28.  Subsequent to that dinner, Mark began to sollict Cartledge for further information concerning Cartledge's inventions.   Cartledge never pursued him nor represented to him that Dr. Girardi had any interest in or connection with Cartledge's inventions.

29.  At some point in the late winter or early spring of 2002, Mark contacted Cartledge complaining that he was in several pain and that he was not able to arrange a timely appointment with Dr. Girardi.  Cartledge agreed to see him, examined him, and prescribed reasonable pain medication for a man of Mark's size, which was over 300 pounds, who had recently undergone and extensive and highly invasive surgical procedure for a second time.  At no time did plaintiffs ever inform Cartledge that Mark was also receiving pain medication from other physicians, whether Dr. Girardi, Dr. Montgomery or others.

30.  During the early spring of 2002, Cartledge remained in contact with plaintiffs on a social basis.  Plaintiffs continued to inquire as to the possibility of investing in one of Cartledge's medical devices.

31.  Advanced Cannula, Inc. (henceforth "Advanced" or the "Company") was incorporated in the State of Nevada on May 16, 2002.  A Certificate of Incorporation is annexed hereto as "Exhibit A".

32.  In response to Mark's repeated entreaties, a formal solicitation letter and draft subscription agreement was sent by Advanced to the plaintiffs on or about June 15 2002.  It was initially contemplated by both plaintiffs and Cartledge that plaintiffs would acquire a one third interest in Advanced Cannula for $333,333.

33.  Plaintiffs failed to sign the subscription agreement upon receipt thereof and commenced extensive negotiations with Advanced concerning plaintiffs percentage stake in the Company, the level control of the Company held by that stake, and other aspects of due diligence.  Plaintiffs paid $65,000 to the Company as a deposit pending due diligence.

34.  At some point during the summer of 2002, plaintiffs retained Robert Walper, Esq., of Fox Rothschild LLP to assist them in the due diligence process prior to executing a subscription agreement and shareholder's agreement.

35.  Counsel for the Company and Robert Walper engaged in extensive negotiations during the month of October 2002, prior to the execution by plaintiffs of a subscription agreement and a shareholder's agreement.  Mr. Walper requested numerous changes to the subscription agreement first sent to plaintiffs and numerous assurances that plaintiffs would be protected, including supermajority voting on behalf of plaintiff.

A copy of Mr. Walper's October 14, 2002 letter is annexed hereto as "Exhibit B" and a copy of counsel's response for the Company is annexed hereto as "Exhibit C".

36. After additional extensive negotiations in late October, 2002, a version of the subscription agreement and shareholders agreement acceptable to all parties was sent to Mr. Walper for signature by plaintiffs, his clients, on October 31, 2002. These documents were signed by plaintiffs on November 6, 2002.

37. Cartledge, and, on information and belief, the Company, had no further contact with plaintiffs or their attorney until March 28, 2003, at which time Mr. Walper wrote to the Company's attorney seeking rescission on the ground that plaintiffs, his clients, had not received a stock certificate evidencing their investment. Neither Mr. Walper or plaintiffs had ever previously requested a stock certificate. Said stock certificate was promptly sent to him, together with copies of the fully executed subscription and shareholders' agreements. They have never been returned as rejected.

38. Plaintiffs and their attorney, Robert Walper, continued to insist that plaintiffs were entitled to rescission throughout April 2003. On or about May 13, 2003, Mr. Walper faxed to the offices of the Company's attorney a copy of a complaint to the New York State Department of Health Office of Professional Medical Conduct alleging numerous instances of unethical activities and of professional misconduct on the part of Cartledge and co-defendant Leonard Lee, M.D. Mr. Walper's accompanying voice mail message to the Company's attorney stated that the complaint would be filed if the Company did not agree to rescind plaintiff's investment. The Company declined to do so. A copy of this complaint is annexed hereto as "Exhibit D".

39. On or about January 23, 2004, the Company's attorney was contacted by Jeffrey LaRosa, Esq., of Schenck, Price, Smith & King, LLP, who purportedly also represented plaintiffs for the purpose of seeking rescission of plaintiffs' investment. The Company again declined to grant plaintiffs rescission.

40. On or about March 1, 2004, plaintiffs met with officials of Cornell Medical Center and the New York Presbyterian Hospital, in particular O. Wayne Odom, Chief of Cardiothoracic Surgery and asserted that Cartledge had engaged in unethical activities and professional misconduct in connection with the sale of shares in the Company to plaintiffs. On information and belief, plaintiffs also threatened to go to the publicize their version of the situation unless Dr. Odom and Cornell Medical Center took an active role in obtaining rescission for them.

41. Plaintiffs have maligned the medical ethics and professional competence of Cartledge knowing full well that their allegations were groundless and for the sole purpose of obtaining rescission of a contract plaintiffs negotiated over a long period of time and with the full assistance of competent counsel.

42. Cartledge has consequently suffered severe damage to his reputation and to his standing in his profession due to the knowing misrepresentations by plaintiffs to third parties.

WHEREFORE, defendant Cartledge, plaintiff on the Counterclaim, demands judgment on the counterclaim for defamation against plaintiffs Mark Imperatore and Daun Imperatore in the amount of $5,000,000.

## AS AND FOR A SECOND COUNTERCLAIM-PUNITIVE DAMAGES

43.  Defendant Cartledge, plaintiff on the counterclaims, repeats and realleges the allegations set forth in paragraphs 25 through 42 as if more fully set forth herein.

44.  Plaintiffs' actions in maligning the medical ethics and professional competence of Cartledge to third parties were willful, wanton, and made knowing such representations were untrue for the sole purpose of obtaining rescission of a contract which plaintiffs had negotiated over a period of several months with the full assistance and participation of competent counsel.

45.  Plaintiffs were acting in bad faith at all relevant times therein.

WHEREFORE, defendant Cartledge, plaintiff on the Counterclaims, demands judgment on the counterclaim for punitive damages against plaintiffs Mark Imperatore and Daun Imperatore in the amount of $15,000,000.

LAW OFFICES OF MITCHELL CANTOR
Attorneys for defendant Richard Cartledge, M.D.

Mitchell Cantor (MC 5401)
470 Park Avenue South, 12th Floor
New York, NY  10016
Tel. (212) 679-7820
Fax (212) 686-3822

To:  FOX ROTHSCHILD, LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ  08648-2311
Tel. (609) 896-3600
Attorneys for plaintiffs Mark Imperatore and Daun Imperatore

TOTAL P.02
MAY-16-2002  16:58                                                    P.02/02



**DEAN HELLER**
**Secretary of State**

202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684 5708

┌─────────────────────────────┐
│      **Articles of**        │
│    **Incorporation**        │
│  (PURSUANT TO NRS 78)       │
└─────────────────────────────┘

Office Use Only:

**FILED #** C 12481-02

MAY 1 6 2002

DEAN HELLER, SECRETARY OF STATE

**Important:** Read attached instructions before completing form.

| | |
|---|---|
| **1. Name of Corporation:** | ADVANCED CANNULA, INC. |
| **2. Resident Agent Name and Street Address:** (must be a Nevada address where process may be served) | The Corporation Trust Company of Nevada<br>Name<br>6100 Neil Road, Suite 500,   Reno.   , NEVADA  89511<br>Street Address   City   Zip Code |
| **3. Shares:** (number of shares corporation authorized to issue) | Number of shares with par value: 100,000  Par value: $.001  Number of shares without par value: |
| **4. Names, Addresses, Number of Board of Directors/Trustees:** | The First Board of Directors/Trustees shall consist of TWO members whose names and addresses are as follows:<br>1. Leonard Lee, M.D.<br>Name  435 E 70th St. Apt 12-L  New York  NY  10021<br>Street Address   City   State  Zip Code<br>2. Richard Cartledge, M.D.<br>Name  1320 York Ave., Apt 13-N  New York  NY  10021<br>Street Address   City   State  Zip Code<br>3.<br>Name<br>Street Address   City   State  Zip Code<br>4.<br>Name<br>Street Address   City   State  Zip Code |
| **5. Purpose:** (optional–see instructions) | The purpose of this Corporation shall be: |
| **6. Other Matters:** (see instructions) | Number of additional pages attached: |
| **7. Names, Addresses and Signatures of Incorporators:** (attach additional pages if there are more than 2 incorporators) | MITCHELL CANTOR   Mitchell C.<br>Name  Signature<br>470 Park Ave South, 14th floor  New York  NY  10016<br>Address   City   State  Zip Code<br>Name  Signature<br>Address   City   State  Zip Code |
| **8. Certificate of Acceptance of Appointment of Resident Agent:** | THE CORPORATION TRUST COMPANY OF NEVADA<br>I, _____ hereby accept appointment as Resident Agent for the above named corporation.<br>_Hillary_  HILLARY ENGLAND  05/16/2002<br>Authorized Signature of R.A. or On Behalf of R.A. Company  Date<br>SPECIAL ASSISTANT SECRETARY |

This form must be accompanied by appropriate fees. See attached fee schedule.

Nevada Secretary of State Form CORPART1559.91
Revised on 07/21/01

nvd01 - 8-07/2001 © CT System Online



# CORPORATE CHARTER

I, DEAN HELLER, the duly elected and qualified Nevada Secretary of State, do hereby certify that **ADVANCED CANNULA, INC.** did on **May 16, 2002** file in this office the original Articles of Incorporation; that said Articles are now on file and of record in the office of the Secretary of State of the State of Nevada, and further, that said Articles contain all the provisions required by the law of said State of Nevada.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office, in Carson City, Nevada, on **May 17, 2002.**

Secretary of State

By

Certification Clerk

/14/02   MON 15:31 FAX 215 699 0231        F. R. O. & F.        215 699 0231                     002

# FOX • ROTHSCHILD
## O'BRIEN & FRANKEL LLP
### ATTORNEYS AT LAW

1250 SOUTH BROAD STREET • SUITE 1000 • P.O. BOX 431 • LANSDALE, PA 19446-0431
215-699-6000 • FAX 215-699-0231 • www.frof.com

Robert A. Walper
Direct Dial: (215) 661-9408
Internet Address: rwalper@frof.com
File No. 41999-00001

October 14, 2002

**Via Fax #1-212-686-3822**

Mitchell Cantor, Esquire
470 Park Avenue South,
12th Floor
New York, NY  10016

Re:    Mark and Daun Imperatore – Investment in Advanced Cannula, Inc.

Dear Mitch:

Following up on our discussions, attached is a copy of the Rider to the Subscription Agreement which was previously circulated and, as I understand, agreed by Leonard and Richard.  Please incorporate these provisions in the Subscription Agreement, and include signature lines for Leonard and Richard to personally sign the Subscription Agreement, agreeing to be bound to the representations and warranties set forth therein.

Also, it is my understanding that the parties agreed that the By-Laws of the corporation will be amended to provide that a supermajority vote will be necessary to take action on the following key issues:

*S/w Leonard Lee*

A.    Change in Capitalization of the Corporation;   *No*
B.    ████ ████ ████;   *No*
C.    ███ █ ████ ██ ██ Intellectual Property;   *No*
D.    Patent/FDA Process Decisions;   *No*
E.    New Products/Projects to be Undertaken by the Corporation;   *Yes No*
F.    ████ ████ Reorganization Involving the Corporation;
G.    ████ ███ and Winding Up of the Corporation;   *No*
H.    Declaration of a Dividend;   *No*
I.    Payments Inconsistent with the Operating Budget or Projected Uses of Funds invested by the Imperatores;   *??? No   ok*
J.    Change in the Size of the Board of Directors; and   *ok*
K.    ████████ of or Change in Officer or Shareholder Compensation   *ok*

/14/02  MON 15:32 FAX 215 699 0231        F. R. O. & F.        215 699 0231        ☑003

Mitchell Cantor, Esquire
October 14, 2002
Page 2


By virtue of Mark and Daun owning a 15% interest in the corporation, the supermajority required to pass on the above matters should be 86%.

I assume that you will also incorporate into the Subscription Agreement and Shareholder's Agreement the matters we discussed. To the extent there is any question as to any of the matters discussed, or if your client is not in agreement with any points discussed, please do not hesitate to call.

I look forward to working with you in connection with this matter.

Very truly yours,

Robert A. Walper

RAW:av

cc:    Mark and Daun Imperatore


FOX • ROTHSCHILD
O'BRIEN & FRANKEL LLP

## *Law Offices of Mitchell Cantor*

470 Park Avenue South, 12th Floor
New York, New York 10016
Telephone (212) 679-7820
Fax (212) 686-3822

October 18, 2002

BY FAX (215) 699-0231

Robert Walper, Esq.
Fox Rothschild O'Brien & Frankel
1250 South Broad Street, Suite 1000
Lansdale, PA 19446-0431

Re: <u>Advanced Cannula, Inc.</u>

Dear Mr. Walper:

Further to our letter of October 14, 2002, I have now had the opportunity to discuss the terms of your client's investment in Advanced Cannula with Dr. Lee, President of Advanced Cannula. It is my understanding that Dr. Lee and your client, Mr. Imperatore, have agreed that the major corporate decisions, as set forth in your letter of October 14, will require a majority vote of 55%. Dr. Lee has also agreed to in essence subordinate the $200,000 note from Advanced to him and Dr. Cartledge to Mr. Imperatore's equity to the extent that all of the equity holders, including but not limited to your client, will have priority over the note holders in the event that the company is sold.

Dr. Lee and Mr. Imperatore also discussed providing Mr. Imperatore with the option to acquire additional stock. In that regard, Advanced Cannula is delighted to grant Mr. Imperatore an option acquire an additional five percent (5%) of the outstanding stock of Advanced Cannula for a total consideration of $50,000. This option shall be a firm option exercisable by Mr. Imperatore at any time on or before November 5, 2002 by the tender to Advanced Cannula of the $50,000 purchase price for this stock. This option shall expire on November 5, 2002 if unexercised.

I look forward to working with you and should have the shareholders agreement completed on Monday, October 21. If you have any further questions do not hesitate to contact me.

Very truly yours,

Mitchell Cantor

05/13/03  TUE 09:09 FAX 215 699 0231        F. R. O. & F.                    ☑002

New York State Department of Health
Office of Professional Medical Conduct

Complaint Form

Please print and complete and return to the Office of Professional Medical Conduct, 433 River
St., Suite 303, Troy, NY, 12180-2299
(This form will not be sent electronically.)
-- See instructions --
All reports of misconduct are kept confidential and are protected from disclosure according to New York State Public
Health Law, Sections 230(10)(a)(v) and 230(11)(a). Any person who reports or provides information to the Board for
Professional Medical Conduct in good faith, and without malice, shall not be subject to an action for civil damages or other
relief as the result of making the report according to Section 230(11)(b).

INFORMATION ABOUT YOU

Name        MARK H. IMPERATORE

Address     748 GALLOPING HILL ROAD, FRANKLIN LAKES, NJ 07417

Telephone   (201) 891-6403 (home) or (201) 891-2662 (work)

(If you do not have a daytime telephone number, please provide a number where
a message can be left for you during the day).

PHYSICIAN OR PHYSICIAN ASSISTANT

Name        RICHARD CARTLEDGE, M.D.
Address     1150 North 35th Avenue, Suite 440, Hollywood, Florida 33021
Telephone   (954) 922-5735

PHYSICIAN OR PHYSICIAN ASSISTANT

Name        LEONARD LEE, M.D.
Address     435 East 70th Street, New York, NY 10021
Telephone   (212) 746-2189

COMPLAINT

Describe your complaint as completely as you can. Please sign and date the
form.

Patient's Name    MARK H. IMPERATORE
Date of Birth  4 / 16 / 55
Social Security Number  1 42 - 40 - 9125

When did this happen? SEE BELOW

Where did this happen? SEE BELOW

Have you filed a complaint with anyone else? Yes_____  No  X

If yes, with whom? **ALTHOUGH NOT YET FILED, PLAINTIFF IS PREPARING TO FILE A CIVIL ACTION AGAINST BOTH PHYSICIANS.  ALSO, A COMPLAINT IS EXPECTED TO BE FILED AGAINST DR. CARTLEDGE IN FLORIDA.**

Names of Witnesses     **MARK IMPERATORE, DAUN IMPERATORE, LEONARD LEE, M.D., LEONARD GIRARDI, M.D., RICHARD CARTLEDGE, M.D.**

Description

In November of 2001, the patient, Mark H. Imperatore (the "Patient") was in need of a top aortic surgeon because the Patient was facing an aortic dissection for the second time. The Patient's aorta was 11 centimeters, when a normal aorta is approximately 2.8 centimeters. Through friends, family and research, the Patient and his wife chose Doctor Leonard Girardi, M.D. and his team of top surgeons at Cornell Weil /New York Hospital (the "Hospital") to perform this very difficult and life threatening procedure. Dr. Girardi checked the Patient into the Hospital the day after Thanksgiving 2001, and the Patient underwent surgery on November 27, 2001.

The Patient chose Dr. Girardi as his surgeon not only based on his national reputation as the "best aortic surgeon in the US," but also how Dr. Girardi spoke about his "top team" and how everyone on his team was a key player. This was very important to the Patient and his family as, per Dr. Girardi, this was one of his most difficult cases due to the size of the Patient's aorta and the Patient's weight.

Dr. Richard Cartledge was on Dr. Girardi's team, and assisted with the Patient's surgery. The Patient's wife, Daun Imperatore, met Dr. Cartledge immediately after the Patient's surgery when the Patient was in the Intensive Care Unit, and Dr. Cartledge told Mrs. Imperatore that he was personally assigned to the Patient's case and was there to assist the Patient and his family in any manner possible. The Patient's family was impressed by Dr. Cartledge's energy and willingness to provide immediate assistance. The Patient and his family became very comfortable with the professional skills and care of Dr. Cartledge, and willingly placed the Patient's life in Dr. Cartledge's hands.

Once, when an emergency arose and Daun Imperatore was unable to reach Dr. Girardi one weekend while he was playing golf, Dr. Cartledge came immediately to the Patient's assistance and ordered a blood transfusion for the Patient, who was failing. Dr. Girardi came in on his day off immediately afterwards.

Following his surgery, when the Patient was recovering in the Hospital, Dr. Cartledge discussed with the Patient his inventions, and asked his help as a business man to suggest a way to find funding for several of his projects. This persisted the whole time the Patient was in the Hospital. Dr. Cartledge communicated to the Patient how he was a "boy wonder" who had completed his undergrade and medical degree in 6 years. At the time of the Patient's release, Dr. Cartledge gave the Patient his personal home and beeper telephone numbers, so that the Patient could get in touch with him at any time.

The Patient was very impressed by all of the doctors who saved his life, including Dr. Cartledge. The Patient was terrified about this last surgery, as the Patient had been recently married, and had a 7 month old daughter. The Patient had faced this surgery several years before in an emergency situation, but this time it was more terrifying for him. The Patient held his doctors in the highest regard, and felt the desire to help them and show his gratitude as much as possible.

In July of 2002, Dr. Cartledge informed the Patient that when he was admitted to the Hospital, Dr. Girardi informed his team and staff that the Patient was a VIP and he was an affluent, prominent person, and thus needed to have "red carpet" treatment.  In fact, the Patient is not as affluent as thought by Dr. Girardi and Dr. Cartledge.

Dr. Cartledge regularly called the Patient after he was released from the Hospital. In these calls, Dr. Cartledge prescribed medications, asked about the Patient's health and arranged meetings to examine and meet the Patient outside of a professional setting. During these telephone calls and meetings, the Patient spoke to Dr. Cartledge at great length about Dr. Cartledge's inventions. One of these meetings included lunch in New York City in or about January, 2002.

One time, while Dr. Cartledge examined the Patient at Dr. Cartledge's apartment in New York City, Dr. Cartledge brought up the suggestion that the Patient should become an investor in one of Dr. Cartledge's projects known as Advanced Cannula, Inc. Because of the trust, confidence and appreciation he had for Dr. Cartledge as his treating physician, the Patient indicated that he may consider such an investment. Dr. Cartledge mentioned that Dr. Leonard Lee was on Dr. Girardi's team of highly credentialed doctors, and suggested that he arrange for the Patient to meet Dr. Lee as soon as possible.

Following this meeting in Dr. Cartledge's apartment, Advanced Cannula, Inc. was introduced more formally to the Patient, and Dr. Cartledge

provided information regarding the project to the Patient. With respect to this project, Dr. Lee was the inventor of a cannula instrument which was the subject to the project, and Dr. Cartledge was a partner.

On January 19 or 20, 2002, the Patient and his wife, as well as a family friend, met for dinner with Dr. Cartledge in New York City. The dinner conversation was primarily about Dr. Cartledge's background and inventions.

In January or February, 2002, the Patient's wife contacted Dr. Cartledge to discuss her concern about the pain relievers being prescribed to the Patient by Dr. Cartledge as well as the Patient's cardiologist, who was a referral from Dr. Girardi. The Patient's cardiologist was looking to wean the Patient from these pain relievers because of his concern about the volume of the pain relievers being taken and a concern of the Patient's wife that she believed the pain relievers were causing the Patient to suffer from depression. The Patient's cardiologist was not aware that Dr. Cartledge was also prescribing pain relievers, while Dr. Cartledge knew that the Patient's cardiologist was prescribing pain relievers. All of this was communicated to Dr. Cartledge, and he said that he felt the pain relievers were needed and discounted the Patient's cardiologist's and wife's expressions of concern.

In April or May, 2002, the Patient met Dr. Lee at Dr. Cartledge's apartment in New York City. Both Dr. Cartledge and Dr. Lee examined the Patient that day. Dr. Cartledge was also prescribing pain medication for the Patient at that time and for several months after surgery. Because of this treatment and the fact that Dr. Lee was on Dr. Girardi's team of physicians assigned to provide the Patient with post-surgery care, the Patient considered himself to be under the care of both Dr. Cartledge and Dr. Lee. Also, Dr. Cartledge, in introducing Dr. Lee, advised the Patient that Dr. Lee knew all about the Patient's case because he was on Dr. Girardi's staff.

Following the Patient's meeting with Drs. Cartledge and Lee at Dr. Cartledge's apartment, the relationships progressed, and Dr. Cartledge kept providing the Patient with brochures and information on Advanced Cannula, Inc. Dr. Cartledge advised the Patient that Advanced Cannula, Inc. was offered third-party private placement investments for its cannula invention, but they really wanted the Patient to be part of the project because they liked him so much and he had great business acumen. They said it would be great to be partners with the Patient.

Dr. Cartledge told the Patient that Dr. Girardi was interested in the project,

but they did not want him as a partner because he "had too much money already" and Drs. Cartledge and Lee did not want to mix business and pleasure. Dr. Cartledge also advised the Patient that Dr. Girardi was sold on the product and would use it in "a second," and the Patient could speak to Dr. Girardi anytime about it.

The conversations about this project and the possible investment by the Patient continued for a few more weeks. Drs. Cartledge and Lee continued to pressure the Patient into considering an investment into Advanced Cannula, Inc. Ultimately, on June 15, 2002, the Patient received a letter from Drs. Cartledge and Lee seeking a commitment for the Patient's investment in Advanced Cannula, Inc. in the amount of $333,333.00.

During the first week of July, 2002, after having received the investment letter form Drs. Cartledge and Lee, the Patient and his family went to their house in Maine. During this time, the pressure from Drs. Cartledge and Lee to invest continued. The Patient invited Drs. Cartledge and Lee and their guests to their Maine home for a weekend to continue the discussion about the project and the investment requested, as well as to possibly provide Drs. Cartledge and Lee with a deposit check. The idea that Dr. Girardi was interested in the cannula to be promoted by the company was a key selling point for the Patient, as the Patient holds Dr. Girardi with the highest regard. The Patient was advised by Drs. Cartledge and Lee that "Dr. Girardi is drooling to get in."

Drs. Cartledge and Lee came to the Patient's Maine house late on July 6, 2002 to further solicit an investment from the Patient, at which time the Patient gave them a deposit check in the amount of $65,000. Drs. Cartledge and Lee did not stay the weekend as planned, and left on July 7, 2002 after having received the Patient's deposit check.

After the Patient advanced this initial deposit to Drs. Cartledge and Lee, the doctors continued to seek the full investment originally requested in their June 15, 2002 letter, claiming that if the Patient did not come up with the balance requested, they would not return the Patient's deposit. Drs. Cartledge and Lee continuously told the Patient, "trust us, we are surgeons, this invention is revolutionary, we know our stuff."

Dr. Cartledge left the Hospital in July/August 2002 and finished his fellowship. He has taken a position in Florida which he never mentioned until the trip to Maine. Following Dr. Cartledge's departure, Dr. Lee began speaking to the Patient more and providing the Patient's ongoing

would be closed within 90 days, and because of their history with Drs. Cartledge and Lee, the Patient and his wife felt they had to continue. On November 6, 2002, the Patient and his wife executed a subscription agreement, formally offering to invest $200,000 in Advanced Cannula, Inc.

Upon executing the subscription agreement and providing the balance of the deposit to Dr. Lee as requested, the Patient and his wife asked about the "significant new development". Dr. Lee told the Patient and his wife that he would not tell them anything until their check cleared. Also, the Patient and his wife asked for Dr. Lee to sign the subscription agreement and to issue to them stock certificates, signifying an acceptance of the investment. Dr. Lee assured them that the subscription agreement would be signed and stock certificates issued, and both would be forwarded to them immediately. Dr. Lee also told the Patient and his wife that they would immediately receive an accounting of the prototype costs, which was the next step. Two days later, the Patient and his wife again asked Dr. Lee for these materials and details on the significant new development. Dr. Lee advised them that their check still had not cleared, so he was not willing to tell them any information.

The Patient asked on numerous occasions for the executed investment documents, prototype cost breakdown and information on the "significant new development." Both Drs. Cartledge and Lee always promised to send them right away. They never came. Thereafter, when the Patient met with Dr. Girardi for a follow up appointment after submitting his deposit to Drs. Cartledge and Lee, the Patient asked Dr. Girardi casually about a supposed cannula invention he had heard about. Dr. Girardi stated that he had not heard about the invention before, which was a shock to the Patient as Drs. Cartledge and Lee promoted the investment on the basis of Dr. Girardi's excitement over it.

The calls and return calls from Dr. Cartledge became less and less. The Patient had to make all of the contact calls. On numerous occasions, the Patient made requests for the executed investment documents, costs breakdowns and information on the "significant new development", and was always promised a response but nothing was ever produced. Before obtaining the Patient's deposit checks, Dr. Lee told the Patient in a conversation in March, 2002, that when someone asks him for something, he does it immediately in triplicate, and gets it out, and that he doesn't "sit on any paperwork."

Ultimately, after receiving no information or response from Drs. Cartledge

treatment. Also, each time the Patient met with Dr. Lee, Dr. Lee would examine the Patient.

When the Patient would meet with Dr. Girardi for follow up appointments at Dr. Girardi's office, the Patient was instructed by Drs. Cartledge and Lee to not let on that they had a relationship outside of the office, as it would be uncomfortable for them as Dr. Girardi frowned on outside relationships (which was inconsistent with their prior statements that the Patient was free to discuss this with Dr. Girardi).

The Patient and his wife were uncomfortable with the pressure from Drs. Cartledge and Lee about the investment, but the Patient highly respected them as doctors and enjoyed their relationship. In one discussion with Dr. Lee, Dr. Lee said, "What is $200,000 or $300,000 to you? You have the commitment for other investments, but you can't stand by your commitment to us."

After the continuous pressure from Drs. Cartledge and Lee to sign a subscription agreement to offer to invest in Advanced Cannula, Inc., the Patient and his wife consulted with an attorney, Robert Walper, Esquire to protect their interests. At this time, the Patient and his wife were feeling significant pressure to give more money to Drs. Cartledge and Lee, and were questioning some facts claimed by Drs. Cartledge and Lee about the cannula invention.

The Patient and his wife received numerous suggestions from Attorney Walper on how best to protect their interests if they proceeded with an investment in Advanced Cannula, Inc., many of which were not pursued as a result of the Patient's respect and trust of Drs. Cartledge and Lee and the Patient's fear of upsetting or offending them or jeopardizing their relationship. Also, as the Patient and his wife were hesitating on proceeding with an investment, the Patient spoke with Drs. Cartledge and Lee and was told that there were significant new developments, there was a deal on the table, and if the Patient didn't invest he would be kicking himself after the significant developments were disclosed. Drs. Cartledge and Lee insisted that the Patient and his wife had to invest immediately before the significant development occurred, or he would lose the opportunity to invest.

The Patient and his wife asked for permission to speak to Dr. Girardi to get comfort with the project, but were asked not to by Dr. Lee, since he was concerned about his job and how this would make him uncomfortable. This concerned the Patient and his wife, but when Drs. Cartledge and Lee insisted that the deal that would make them rich was on the table and

and Lee, the Patient and his wife, through Attorney Walper, terminated their offer to invest in Advanced Cannula, Inc. as set forth in the subscription agreement they signed. The day after this termination, Drs. Cartledge and Lee, through their counsel, attempted to effectuate the subscription agreement by delivering to them a signed subscription agreement and shares of stock in Advanced Cannula, Inc., claiming that they were signed by Drs. Cartledge and Lee once they received the subscription agreement from the Patient and held by the attorney in escrow, although this was proven inaccurate by the fact that the stock certificates were dated <u>after</u> the date of the Patient's termination letter.  Drs. Cartledge and Lee have refused to return the deposits made by the Patient, and the Patient will be initiating a civil action to recover the same.

It is believed, and therefore averred, that the actions of Drs. Cartledge and Lee as outlined herein were fraudulent and undertaken to intentionally deceive the Patient and his wife and to induce them to invest in a company which has little to no value, all in violation of Education Law 6530, Section 2 and other applicable laws.

It is further believed, and therefore averred, that Drs. Cartledge and Lee used and abused their positions as respected and trusted treating physicians of the Patient and exercised undue influence over the Patient to induce his investment and to exploit him for financial gain, all in violation of Education Law 6530, Section 17 and other applicable laws.

Signature _____   Date 5/8/03

DOH-3867www (7/97)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————————————— X

MARK IMPERATORE AND DAUN
IMPERATORE,

              Plaintiffs,

      v.

LEONARD Y. LEE, M.D., RICHARD
CARTLEDGE, M.D., ADVANCED CANNULA,
INC., WEIL MEDICAL COLLEGE OF
CORNELL UNIVERSITY, NEW YORK-
PRESBYTERIAN HOSPITAL,

              Defendants.

————————————————————————————— X

Civil Action No. 04 CV 8921

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                      ) ss:
COUNTY OF NEW YORK  )

    DAVID CHOW, being duly sworn, deposes and says:

    1. I am over eighteen years of age, reside in Brooklyn, NY and am not a party to
the above captioned action. On December 10, 2004, I served the Answer with
Affirmative Defenses and Counterclaims of defendant Richard Cartledge, M.D. on
counsel for Plaintiffs which I placed into an envelope designated for United States Postal
Service next day delivery.   The envelope was addressed as follows:

        FOX ROTHSCHILD, LLP
        997 Lenox Drive, Building Three
        Lawrenceville, NJ 08648-2311

    I swear that the foregoing is true under penalty of perjury.

                                _____
                                DAVID CHOW

Sworn to before me this
10th day of December, 2004

_____
Notary Public

MITCHELL CANTOR
Notary Public, State of New York
No. 02CA6021436   02CA6085486
Qualified in New York County
Commission Expires March 16, 2001
December 30, 2006