# EXHIBIT A

**FOX ROTHSCHILD LLP**
Formed in the Commonwealth of Pennsylvania
By:      Frank E. Derby, Esquire (FD 2190)
         Thomas R. Hower, Esquire (TH 9793)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600
Attorneys for Plaintiffs, Mark Imperatore and Daun Imperatore

04  CV    8921

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| MARK IMPERATORE AND DAUN IMPERATORE, | X<br>:<br>:<br>: Civil Action No.<br>: |
| Plaintiffs, | :<br>: |
| v. | :<br>: |
| LEONARD Y. LEE, M.D., RICHARD CARTLEDGE, M.D., ADVANCED CANNULA, INC., WEILL MEDICAL COLLEGE OF CORNELL UNIVERSITY, NEW YORK - PRESBYTERIAN HOSPITAL, | :<br>: **COMPLAINT AND JURY DEMAND**<br>:<br>:<br>: |
| Defendants. | :<br>X |

---

Plaintiffs Mark Imperatore ("Mark") and Daun Imperatore ("Daun") make

allegations against defendants Leonard Y. Lee, M.D. ("Lee"), Richard Cartledge, M.D.

("Cartledge"), Advanced Cannula, Inc. ("Cannula"), Weill Medical College of Cornell University ("WMC") and New York Presbyterian Hospital ("NYPH") as follows:

## THE PARTIES

1.      Mark is a citizen of New Jersey residing at 748 Galloping Hills, Franklin Lake, New Jersey.

2.      Daun is a citizen of New Jersey residing at 748 Galloping Hills, Franklin Lake, New Jersey.  She is Mark's wife.

3.      Lee is a citizen of New York and a doctor licensed to practice medicine residing at 435 East 70th Street, New York, New York.

4.      Cartledge is a citizen of Florida and a doctor licensed to practice medicine with an office located at 1150 North 35th Avenue, Suite 440, Hollywood, Florida.

5.      Cannula is a Nevada corporation with a principal place of business located at 435 East 70th Street, New York, New York.

6.      WMC is a medical college that trains physicians with a principal place of business located at 1300 York Avenue, New York, New York.

7.      NYPH is a hospital with a principal place of business located at 710 West 168th Street, New York, New York.

## JURISDICTION & VENUE

8.      This Court has jurisdiction over this action, under 28 U.S.C. § 1331 because this action arises under the Federal securities laws of the United States, 42 U.S.C. §§ 1395, *et seq.*

9.      This Court also has jurisdiction over this action under 28 U.S.C. § 1332 inasmuch as all defendants are residents of different states then all plaintiffs and the

amount in controversy exceeds $75,000 exclusive of fees, interest and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a).

10.     Venue is this District is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims have occurred in this Judicial District.

## MARK'S LIFE-THREATENING HEART CONDITION

11.     In November 2001, Mark had congestive heart failure that required an aortic dissection on an emergency basis.

12.     Mark's aorta was distended to 11 centimeters, while a normal aorta is about 2.8 centimeters.

13.     After careful consideration of various surgical options, Mark chose Leonard Girardi, M.D. and his team to perform the surgery at NYPH.

14.     Dr. Girardi was chosen because of the excellent reputation as a heart surgeon enjoyed by he and his team of surgeons and NYPH also has a worldwide reputation for excellence in heart surgery and an excellent medical staff.

15.     Dr. Girardi  labeled plaintiff's case as a difficult one because of the size of plaintiff's aorta and his weight.

16.     Plaintiff's surgery was performed on November 27, 2001 and was successful.

17.     Dr. Cartledge assisted in Mark's heart surgery with Dr. Girardi.

18.     Mark understood the serious nature of his heart condition because he had a prior similar procedure and he was greatly impressed by the doctors on Dr. Girardi's

team to whom he owed his life.  He was also recently married to Daun and had a seven month old daughter, Laina.

19.    Daun was greatly relieved by Dr. Cartledge's assurances and impressed by his energy and willingness to provide immediate assistance to her and Mark after the surgery.

20.    Daun and Mark would become more and more willing to rely on Dr. Cartledge because of his medical skills and willing attitude to be of service to them.

21.    Seriously ill patients who have significant heart surgery develop an implicit trust in their doctors that borders on deification.

## MARK'S PROMINENT FAMILY

22.    The Imperatore Family is well known in the New York metropolitan area for their considerable business interests in the transportation industry and their extensive charitable philanthropy.

23    Mark's father and uncles founded and developed APA Transport in North Bergen, New Jersey which became one of the largest trucking companies in the United States.

24    Mark's Uncle Arthur developed The New York Waterway ferry service between Weehawken, New Jersey and New York City.

25    Mark's father and uncles founded and developed Imperatore Courier Service in Little Ferry, New Jersey.

26    Mark's father was on the board of directors of Valley Hospital in Ridgewood, New Jersey for many years. Mark's father and uncles have donated over one million dollars to Palisades General Hospital in North Bergen, New Jersey.  Mark's

LV1 288553v2 11/10/04

father and uncles have also made substantial monetary contributions to Englewood Hospital in Englewood, New Jersey. Mark's father and uncles have also made significant monetary contributions to the Deborah Heart and Lung Foundation.

## MARK IS IDENTIFIED AS "VIP" AND RECEIVES SPECIAL TREATMENT FROM NYPH

27.     After the surgery, Dr. Cartledge told Mark that when he was admitted to NYPH, Mark was identified as a VIP because he was an affluent person from a prominent family. Dr. Cartledge also said that Mark was to receive "red carpet" treatment from the doctors and that this VIP status was widely known among the staff.

28.     Mark received a private room while he was a patient at NYPH. Mark was not billed for a private room by NYPH.

29.     Doctors came in to treat Mark on their days off; they did not just phone in instructions to available staff.

30.     Mark did not request this designation nor special treatment from WMC or NYPH.

## DR. CARTLEDGE DOMINATES MARK'S POST-OPERATIVE CARE

31.     After the surgery as Mark was in the intensive care unit, Dr. Cartledge immediately met Daun and told her that he was personally assigned to Mark's case and was there to assist Mark and his family in any possible way.

32.     Dr. Cartledge handled a weekend emergency after Mark's surgery when Dr. Girardi was unavailable. When Mark's health was showed signs of failing, Dr. Cartledge immediately came into the hospital and ordered a blood transfusion for Mark, which reversed Mark's slide.

33.    Dr. Cartledge told Mark and Daun that he was their personal "MP" or medical professional.  He did this on numerous occasions.  Dr. Cartledge's interest in Mark, however, clearly extended beyond his health.

34.    Dr. Cartledge spent significant amounts of time on numerous occasions in conversation with Mark.  In addition to discussions about Mark's health, Dr. Cartledge primarily discussed his own background as an inventor of medical devices.  Dr. Cartledge described himself as a "boy wonder" who completed his undergraduate degree and medical degree in only six years.

35.    Dr. Cartledge asked for Mark's advice as a business man regarding funding for the development of his medical inventions.

36.    Mark was discharged from the hospital on December 5, 2001.

37.    At the time of Mark's release, Dr. Cartledge gave Mark a handwritten note with his personal home and beeper numbers and told Mark to contact him at any time.

38.    After Mark's release, Dr. Cartledge regularly called Mark to prescribe medications, ask about Mark's health arrange meetings and discuss his inventions with Mark and funding for his medical inventions.

39.    Dr. Cartledge and Mark participated in numerous telephone conversations and in-person meetings, including several lunch meetings in New York City in or about January and February 2002.

40.    Mark received treatment that far exceeded the type of care received even by post-operative heart patients.

41.    Dr. Cartledge examined Mark in his apartment in New York City. It was during one of these examinations that Dr. Cartledge suggested that Mark invest in one of

LV1 288553v2 11/10/04

his projects known as Advanced Cannula, Inc. Dr. Cartledge told Mark that Dr. Lee who was also on Dr. Girardi's team, was involved in this project and suggested that the three men meet as soon as possible.

42.    Based on the high level of trust reposed in a physician who took such an intense interest in his health, Mark indicated that he would consider the investment.

## MARK IS WORKED ON BY DRS. CARTLEDGE AND LEE TO INVEST MONEY IN ADVANCED CANNULA, INC.

43.    Cannula was supposedly based on an invention by Dr. Lee of a cannula device and Dr. Cartledge was a shareholder in the business. Some information concerning Cannula was provided to Mark.

44.    Cannula was discussed during a dinner meeting with Dr. Cartledge in or about January 19 or 20, 2002 with Mark and Daun and a friend of their's who worked in the financing of medical enterprises. The dominant dinner conversation concerned Dr. Cartledge's background and inventions.

45.    In or about April 2002, Mark met both Drs. Cartledge and Lee in Dr. Cartledge's New York City apartment. Both Doctors examined Mark and Dr. Cartledge told Mark that Dr. Lee was on Dr. Girardi's surgical team and knew all about his medical case.

46.    Dr. Cartledge's communication with Mark regarding Cannula continued steadily and he told Mark that while Cannula was offering private placement investments to third parties, they really wanted Mark to be a part of this project because they liked him and because of his great business acumen. Dr. Cartledge said it would be "great" to be partners with Mark.

7

47.    Drs. Cartledge and Lee told Mark that Dr. Girardi was interested in the investment, that he was "drooling to get in," but that they did not want him as a partner because "he had too much money already and they did not want to mix business with pleasure." They also told Mark that Dr. Girardi was "sold on the product" and that he would use it "in a second" in his practice, exclusively.

48.    Drs. Cartledge and Lee also told Mark several times that they had another financing deal on the table and that he would kick himself if he did not invest in Cannula.

49.    Mark and Daun were also told that they would get their money back from Cannula in 90 days and "was are your doctors. If you cannot trust us, who can you trust."

## MARK IS PRESCRIBED EXCESSIVE AMOUNTS OF PAIN KILLING PRESCRIPTION DRUG BY DR. CARTLEDGE.

50.    Dr. Cartledge began prescribing medications, including narcotic pain killers, as soon as Mark's surgery was completed and for several months thereafter despite the fact that Drs. Girardi and Montgomery, Mark's cardiologists were also writing such prescriptions.

51.    In or about January 2002, Mark's wife contacted Dr. Cartledge because of her concern regarding Mark's use of the pain killing pills. Her concern was based upon her own observation and the opinion of Mark's cardiologist, who was also referred by Dr. Girardi. Dr. Montgomery was concerned that Mark's consumption of pain killers was excessive and that he should be weaned off of them.

52.    Daun was concerned that Mark's mental state was deteriorating based on the effects of the pills he was taking. He would become very emotional at inappropriate

LV1 288553v2 11/10/04

times and would frequently cry for apparently no reason at all. She feared that Mark was in a deepening depression induced by the pain killers.

53.    Dr. Montgomery was unaware that Dr. Cartledge was also prescribing pain killers for Mark. Dr. Cartledge, however, knew that Drs. Montgomery and Girardi were also prescribing pain killers.

54.    Dr. Cartledge told Daun that Mark needed the pain killers and discounted Dr. Montgomery's concern that the amount of pain killers Mark was taking was excessive.

## MARK GETS FORMAL SOLICITATION LETTER AND FINALLY GIVES A DEPOSIT

55.    The communications from Drs. Cartledge and Lee continued as did the pressure for Mark to invest in Cannula unabated.

56.    On or about June 15, 2002, Mark received a solicitation letter from Drs. Cartledge and Lee seeking a commitment to invest in Cannula in the amount of $333,333.00.

57.    Mark invited his new friends Drs. Lee and Cartledge to his family's summerhouse in Maine for the Fourth of July holiday.

58.    In Maine, Mark was again told that Dr. Girardi was "drooling" to get into the investment.

59.    Drs. Cartledge and Lee arrived at the Maine house late on Saturday, July 6, 2002. They continued to pressure Mark regarding the investment in Cannula.

60.    Mark gave them a check for $65,000.00 as a down payment on his investment.

61.     Drs. Cartledge and Lee did not stay for the weekend as they planned. They left the next day, Sunday, July 7, 2002.

62.     Drs. Cartledge and Lee continued to seek the full amount of the investment from Mark.  They told Mark that they would not return the deposit to him. They assured him by saying "trust us, we are surgeons, this invention is revolutionary, we know our stuff."

63.     On one occasion, Dr. Lee remained Daun "What about your commitment and obligation to us?  You promised this money to us."

64.     Drs. Cartledge and Lee also gave Mark instructions with respect to what to say about their relationship with them to Dr. Girardi.  Mark was told not to "let on" that he had a relationship outside the office with Drs. Cartledge and Lee because Dr. Girardi frowned on outside relationships and it was not comfortable for Drs. Cartledge and Lee.

## THE SUBSCRIPTION AGREEMENT IS EXECUTED AND

## MARK AND DAUN FUND THE INVESTMENT;

## DR. CARTLEDGE LEAVES FOR FLORIDA

65.     Drs. Cartledge and Lee continued to apply pressure to have Mark sign an investment subscription agreement and to fully fund his investment.

66.     In or about July or August, 2002 Dr. Cartledge completed his fellowship at WMC and moved to Florida where he had taken a job at another hospital.

67.     Following Dr. Cartledge's departure, Dr. Lee talked to Mark more and he provided medical care to Mark without Dr. Cartledge.

LV1 288553v2 11/10/04

68.    Drs. Cartledge and Lee told Mark that there were significant new developments with respect to Cannula and that there was another investment deal on the table and that Mark would kick himself if he did not fully invest in Cannula immediately.

69.    Drs. Cartledge and Lee also told Mark many times that if he did not invest soon, he would lose his opportunity to invest in a deal that would make him rich.

70.    Mark and Daun executed a Shareholder Agreement with respect to Cannula share dated November 1, 2002.  See Exhibit "A."

71.    Mark and Daun finally signed the Investment Subscription Agreement on November 6, 2002 and offered the full investment amount which totaled $200,000.00. See Exhibit "B."

72.    Upon completion of these tasks, Mark and Daun asked Dr. Lee about the significant new developments and were told that he could not give them any information until their check cleared.

73.    Mark and Daun told Drs. Cartledge and Lee that all money invested in Cannula was borrowed by them.

74.    Dr. Lee also assured them that stock certificates in Cannula would be issued immediately and that they would receive an accounting of the prototype costs, which was the next step for Cannula.

75.    Two days later, Mark and Daun made the same requests to Dr. Lee and they were told that their check had not cleared yet so he could not share any information.

76.    Mark's subsequent requests of Drs. Cartledge and Lee for information about Cannula and the new development were unanswered, but always with promises that information would be forthcoming.

77.    At an office visit with Dr. Girardi, Mark finally asked him casually about the supposed cannula invention and Dr. Girardi told him that he knew nothing about it. This shocked Mark because he believe that Dr. Girardi knew about the invention and would use it in his practice.

78.    Mark and Daun heard from Drs. Cartledge and Lee less and less as time passed and Mark had to initiate any contact with them. Drs. Cartledge and Lee acted as if they did not want to speak to Mark at all.

79.    Mark repeated his demands for a stock certificate for his investment in Cannula.

80.    After receiving no information about the investment or any response to repeated requests for information to Drs. Cartledge and Lee, Mark and Daun, though their attorney, finally sent a letter demanding the return of their investment dated March 28, 2003. See Exhibit "C." The Subscription Agreement contains a "termination clause" at sections 2.3 and 2.4.

81.    Mark and Daun finally received a stock certificate for Cannula filled out with ball point pen dated April 1, 2003, days after Mark and Daun's termination letter. See Exhibit "D."

82.    Drs. Cartledge and Lee have refused repeated demands to return the investment money to Mark and Daun.

## Count One
### Federal and New Jersey Securities Fraud

83.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 82, as if set forth in full herein.

84.    Mark and Daun are New Jersey residents.

12

85.     Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun that were untrue when they were made.

86.     Drs. Cartledge and Lee made these untrue statements to induce Mark and Daun to invest in Cannula.

87.     Drs Cartledge and Lee knew at the time that the statements were made that they were untrue and that they were material statements about Cannula.

88.     Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

89.     Dr. Cartledge prescribed medication to make Mark amenable to the pressure to invest.

90.     Drs. Cartledge and Lee caused Cannula to issue stock in a company in which Mark and Daun invested.

91.     Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee in violation of 15 U.S.C. § 78j(b) and N.J.S.A. § 49:3-46 *et seq.*

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Two
## Breach of Contract

92.     Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 91, as if set forth in full herein.

13

93.   Mark and Daun signed a Subscription Agreement to invest in Cannula.

94.   The Subscription Agreement provides for termination by the Investor "if any material representation or warranty of the Issuer shall have become untrue in any material respect . . . ."

95.   Mark and Daun paid money to Drs. Cartledge and Lee as required by the subscription agreement to invest in Cannula.

96.   Mark and Daun sought a stock certification for the share of Cannula from Drs. Cartledge and Lee.

97.   Mark and Daun have sought information about Cannula from Drs. Cartledge and Lee about cost projections and new developments which requests have been disregarded and denied.

98.   Drs. Cartledge and Lees refused to provide a stock certificate for Cannula until after Mark and Daun set a termination letter to them with respect to the investment.

99.   Drs. Cartledge and Lee and Cannula have breached their agreements with Mark and Daun, including the Subscription Agreement.

100.   Mark and Daun have been damaged by the breaches of Drs. Cartledge and Lee and Cannula of their agreements.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

LV1 288553v2 11/10/04

### Count Three
### Breach of Covenant of Good Faith And Fair Dealing

101.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 100, as if set forth in full herein.

102.    Inherent in every contract is an obligation of good faith and fair dealing.

103.    Mark and Daun signed a Subscription Agreement to invest in Cannula.

104.    Mark and Daun paid money to Drs. Cartledge and Lee as required by the Subscription Agreement.

105.    Mark and Daun sought a stock certification for the share of Cannula from Drs. Cartledge and Lee.

106.    Mark and Daun have sought information about Cannula from Drs. Cartledge and Lee about cost projections and new developments which requests have been disregarded and denied.

107.    Drs. Cartledge and Lee refused to provide a stock certificate for Cannula until after Mark and Daun set a termination letter to them with respect to the investment.

108.    Drs. Cartledge and Lee have breached the covenant by denying Mark and Daun the benefit of their agreement.

109.    Mark and Daun have been damaged by the breaches of Drs. Cartledge and Lee.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages,

attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Four
## Unjust Enrichment/Restitution

110.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 109, as if set forth in full herein.

111.   Mark and Daun have paid investment money for Cannula to Drs. Cartledge and Lee.

112.   Drs. Cartledge and Lee made various promises to Mark and Daun regarding Cannula and providing information to them about the

113.   Drs. Cartledge and Lee and Cannula have failed to fulfill promises and representations made about Cannula and have provided no information regarding Cannula to Mark and Daun.

114.   Mark and Daun have terminated their agreement to invest in Cannula by letter dated March 28, 2003.

115.   Drs. Cartledge and Lee failed to deliver stock certificates for Cannula for almost six months after Mark and Daun paid their investment, despite demand for a stock certificate until after Mark and Daun terminated their investment.

116.   It would be unfair for Drs. Cartledge and Lee to be allowed to keep mark and Daun's money under these circumstances.

117.   Drs. Cartledge and Lee should have to return Mark and Daun's investment in Cannula or make restitution to them on account of it.

118.   Mark and Daun have been damaged by Drs. Cartledge and Lee's retention of their investment and refusal to return it to them.

16

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Five
## Negligent Misrepresentation

119.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 118, as if set forth in full herein.

120.    Drs. Cartledge and Lee are issuers of stock in a company in which Mark and Daun invested.

121.    Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun.

122.    Drs. Cartledge and Lee made these statements to induce Mark and Daun to invest in Cannula.

123.    Drs. Cartledge and Lee were recklessly unaware about whether the statements that they made about Cannula were true or not or wantonly disregarded whether the statements were true or not.

124.    Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

125.    Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee.

17

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

### Count Six
### Fraud

126.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 125, as if set forth in full herein.

127.    Drs. Cartledge and Lee are issuers of stock in a company in which Mark and Daun invested.

128.    Drs. Cartledge and Lee made numerous statements about material issues about Cannula to Mark and Daun that were untrue when they were made.

129.    Drs. Cartledge and Lee made these untrue statements to induce Mark and Daun to invest in Cannula.

130.    Drs. Cartledge and Lee knew at the time that the statements were made that they were untrue and that they were material statements about funding deals for Cannula and significant developments regarding the product.

131.    Drs. Cartledge and Lee recklessly disregarded the truth when they made statements to Mark and Daun about Cannula.

132.    Drs. Cartledge and Lee's conduct was willful, wanton, egregious and outrageous and it warrants the imposition of punitive damages.

LV1 288553v2 11/10/04

133.    Mark and Daun relied upon these statements in deciding to make their investment in Cannula.

134.    Mark and Daun have been damaged by their reliance on the untrue statements about material issues that were made by Drs. Cartledge and Lee.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

## Count Seven
## Professional Negligence

135.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 134, as if set forth in full herein.

136.    Dr. Cartledge treated Mark following his heart surgery as a physician, including prescribing prescription pain killers and narcotics, including, for example, Percocet, Endocet and Ultram.

137.    Dr. Cartledge prescribed amounts of prescription medication for Mark in excess of that customarily and usually prescribed, even for recent post operative heart patients.

138.    Dr. Cartledge continued to prescribe prescription medications, including pain killers and narcotics even after he was aware that Mark's cardiologist, Dr. Montgomery was also prescribing similar medications.

LV1 288553v2 11/10/04

139.   Dr. Cartledge prescribed prescription medications and pain killers even over the objections of Mark's wife, based on Mark's deteriorating mental state.

140.   Dr. Cartledge prescribed excessive prescription medications to facilitate obtaining investment money from Mark.

141.   Mark was damaged by the excess prescription medication which Dr. Cartledge prescribed for him pain killers.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendant Richard Cartledge, M.D. for compensatory damages, consequential damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this court deems just and equitable.

### Count Eight
### Breach of Fiduciary Duty

142.   Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 141, as if set forth in full herein.

143.   Drs. Cartledge and Lee treated Mark as doctors in whom was reposed Mark total trust and confidence regarding his health and well-being.

144.   All through the relevant period, Dr. Cartledge was prescribing pain medication and pain killers which affected Mark's emotional well-being and ability to think clearly.

145.   During this time period, Drs. Cartledge and Lee also solicited and obtained investment money from Mark for Cannula.

146.   Drs. Cartledge and Lee owed Mark a fiduciary duty based upon their relationship as his trusted surgeons when he was very ill.

LV1 288553v2 11/10/04

147.    Drs. Cartledge and Lee breached this duty by using their special relationship with Mark to obtain investment funds from him by fraud.

148.    Drs. Cartledge and Lee's conduct was willful, wanton, egregious and outrageous and it warrants the imposition of punitive damages.

149.    Mark has been damaged by the breach of fiduciary duty by Drs. Cartledge and Lee because they have refused to return his investment to him.

**WHEREFORE**, plaintiffs Mark Imperatore and Daun Imperatore demand judgment in their favor and against defendants Richard Cartledge, M.D. and Leonard Y. Lee, M.D. for compensatory damages, consequential, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

### Count Nine
### Conversion

150.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 149 as if set forth in full herein.

151.    Drs. Cartledge and Lee obtained Mark and Daun's property, specifically their investment in Cannula, through fraud.

152.    Mark and Daun terminated their investment in Cannula by letter dated March 28, 2003 and demanded the return of their investment money.

153.    Drs. Cartledge and Lee and Cannula are retaining possession of Mark and Daun's property without permission, specifically their investment in Cannula.

154.    Drs. Cartledge and Lee and Cannula have wrongfully refused to return Mark and Daun's property despite repeated proper demand for it.

LV1 288553v2 11/10/04

155.    Mark and Daun are damaged by the continued deprivation of their property without their permission.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendants Richard Cartledge, M.D., Leonard Y. Lee, M.D. and Advanced Cannula, Inc. for compensatory damages, consequential damages, statutory damages, punitive damages, attorneys' fees and costs of suit and for such other and further relief as this Court deems just and equitable.

### Count Ten
### Negligent Failure To Supervise

156.    Plaintiff repeats and realleges each of his allegations from paragraphs 1 through 155, as if set forth in full herein.

157.    WMC owes patients a duty to supervise the performance of doctors that work in its fellowship programs treating patients with serious heart conditions.

158.    NYPH owed its patients a duty to supervise the performance of doctors that work for it treating patients with serious heart conditions.  Mark was identified as a "VIP" upon being admitted to NYPH for surgery.

159.    Drs. Cartledge and Lee were both employed by NYPH.

160.    While he was treating Mark, Dr. Cartledge was a fellow in a fellowship program sponsored and administered by WMC.

161.    Neither NYPH nor WMC detected that Dr. Cartledge over-prescribed prescription pain killers to Mark, including percocet, endocet and ultram.

162.    Neither NYPH nor WMC detected that Drs. Cartledge and Lee misused their positions as treating doctors to obtain investment money from Mark, especially relying on Mark's debilitated mental state from the over-prescription of pain killers..

22

163.   Neither NYPH nor the Medical College took any action to prevent Drs. Cartledge and Lee from pressuring Mark and Daun to make an investment in a business by fraud.

164.   Neither NYPH nor WMC took action to prevent Drs. Cartledge nor Lee from using Mark's identification as a "VIP" patient as a target for their fraudulent investment schemes.

165.   Mark has been damaged by the breach in the duty owed to him by NYPH and WMC.

**WHEREFORE**, plaintiff Mark Imperatore demands judgment in his favor and against defendants Weill Medical College of Cornell University and New York-Presbyterian Hospital for compensatory damages, consequential damages, attorneys' fees and costs of suit and for such other and further relief as this court deems just and equitable.

### JURY DEMAND

Plaintiffs demands a trial by jury as to all issues so triable.

FOX ROTHSCHILD LLP
Attorneys for Plaintiffs Mark Imperatore
And Daun Imperatore

Frank E. Derby (FD 2190)
Thomas R. Hower (TH 3793)
997 Lenox Drive, Building Three
Lawrenceville, NJ 08648-2311
(609) 896-3600 – Telephone
(609) 896-1469 – Facsimile

November 10 , 2004

23

**EXHIBIT A**

# SHAREHOLDER AGREEMENT
## OF
## ADVANCED CANNULA, INC.

SHAREHOLDERS' AGREEMENT, made as of November 1, 2002 (this "Agreement"), by and among Advanced Cannula, Inc., a Nevada corporation with offices at 435 East 70th Street, New York, New York (the "Corporation"), Leonard Lee, M.D., residing at 435 East 70th Street, New York, NY 10021 ("Lee"), Richard Cartledge, M.D., with an office located at 1150 North 35th Avenue, Suite 440, Hollywood, FL 33021 ("Cartledge") and Mark and Daun Imperatore, as tenants by the entireties, residing at 748 Galloping Hill Road, Franklin Lakes, NJ 07417, (together the "Imperatores" or "Imperatore Shareholders") (Lee, Cartledge and the Imperatores being herein collectively referred to as the "Shareholders" and each individually as a "Shareholder").

WHEREAS, the Articles of Incorporation of the Corporation was filed on May 16, 2002;

WHEREAS, the Corporation is authorized to issue one hundred thousand (100,000) shares of Common Stock, (the "Shares"), fifty thousand (50,000) shares of which are currently issued and outstanding;

WHEREAS, the Shareholders own all of the issued and outstanding shares of the Common Stock of the Corporation in the amounts set forth on Exhibit A annexed hereto; and

WHEREAS, the Shareholders and the Corporation desire to regulate the management of the Corporation, the transfer of the Shares now owned or hereafter acquired by the Shareholders, the purchase by the Corporation and/or the Shareholders of the Shares in certain circumstances and certain other matters relating to the Corporation, all in accordance with the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to the following, intending to be bound thereby:

1.    Representations of the Shareholders.

(a)    Each Shareholder represents to and agrees with the other Shareholders and the Corporation that such Shareholder is the legal holder and beneficial owner of the Shares currently owned by such Shareholder, that such Shares and the Shares hereafter acquired by such Shareholder will be owned free and clear of all liens, claims, charges, options and encumbrances other than restrictions on transfer under this Agreement, and that such Shareholder will have the right to transfer such Shares only upon the terms and subject to the conditions of this Agreement.

(b)     Each Shareholder covenants and agrees that to the extent necessary and at the Corporation's request, he shall take all reasonable steps to promptly cooperate with the Corporation in all material respects.

2.     <u>Restriction on Transfer of Shares</u>.

(a)     The Corporation and the Shareholders wish to avoid the transfer of Shares to outside third parties who do not have a knowledge of the Corporation's business and who may disrupt the management of the Corporation.  Accordingly, each Shareholder hereby agrees that each Shareholder shall not, as long as this Agreement is in effect, directly or indirectly sell, assign, mortgage, hypothecate, transfer, pledge, lien, encumber, give or in any way otherwise dispose of (collectively, a "Transfer") any of the Shares (or any interest therein) except as may be expressly permitted by this Agreement.  The Corporation shall not transfer on its books any certificates for the Shares nor issue any certificate in lieu of the Shares unless, in the opinion of counsel to the Corporation, there has been compliance with all of the material conditions hereof affecting the Shares.  Any purported disposition of any Shares made other than in full compliance with the terms of this Agreement shall be null and void and of no force or effect, and shall not be recognized by the Corporation.

(b)     Notwithstanding the general prohibition on the Transfers of Shares contained in Section 2(a) hereof, the Corporation and the Shareholders agree that a Transfer in accordance with Sections 3, 4 or 5 hereof shall be permitted under this Agreement.

(c)     Upon the execution of this Agreement, each Shareholder shall surrender to the Corporation his stock certificate representing the Shares, which stock certificate shall be imprinted with the following legend:

> "The shares represented hereby are subject to the terms of a Shareholders' Agreement, dated as of November 1, 2002, by and among Advanced Cannula, Inc., Leonard Lee, M.D., Richard Cartledge, M.D. and Mark and Daun Imperatore, as joint tenants by the entireties, a copy of which is on file at the principal office of the corporation, and any sale, pledge, gift, transfer, assignment, encumbrance or other disposition of the shares represented by this certificate in violation of said Agreement shall be void and of no effect."

(d)     As a further condition of any Transfer pursuant to this Agreement, each transferee shall, prior to such Transfer, agree in writing to be bound by all of the provisions of this Agreement and no such transferee shall be permitted to make any Transfer that the original transferor was not permitted to make.

3.     <u>Right of First Refusal</u>.

(i)     In the event any Shareholder shall receive a bona fide written offer or enter into an agreement (the "Offer") for the purchase or Transfer of all, and not less than all, of his Shares from an independent third party (the "Outside Party"), such Shareholder shall give

notice (the "Option Notice") to the Corporation and to the other Shareholders containing the name and address of the Outside Party and accompanied by a copy of the Offer. The Shares subject to the Offer are referred to herein as the "Offered Shares". The Option Notice must also include a bona fide contract, including, without limitation price, payment terms, security/collateral, broker, financials of the Outside Party, etc.

(ii)     Upon the giving by a Shareholder of an Option Notice, the Corporation shall have the right (the "Corporation First Refusal Right") to purchase, at the price, on the terms and subject to the conditions specified in the Offer, all of the Offered Shares covered by the Option Notice. Within twenty (20) days after the date of the Option Notice, the Corporation shall notify the Shareholders (the "Corporation Acceptance Notice") of its intention to exercise the Corporation First Refusal Right. Failure to deliver the Acceptance Notice within such period shall constitute a waiver of the Corporation First Refusal Right.

(iii)     If the Corporation shall fail to exercise the Corporation First Refusal Right within the time permitted, the non-transferring Shareholders shall have the right to purchase on a pro rata basis in accordance with their prior percentage of the Corporation's outstanding shares all of the Offered Shares (the "Shareholder First Refusal Right"), at the price, on the terms and subject to the conditions specified in the Offer, by notifying the transferring Shareholder (the "Shareholder Acceptance Notice") within thirty (30) days after the date of the Option Notice. **Failure to deliver the Shareholder Acceptance Notice within the applicable period shall constitute a waiver of such Shareholder's purchase right as to the Offered Shares.**

(iv)     The transferring Shareholder shall have the obligation to sell to the non-transferring Shareholders or the Corporation, as the case may be, such Offered Shares as are covered by the notices referred to in Sections 3(ii) and (iii) hereof. In the event that the non-transferring Shareholders and the Corporation do not elect to purchase pursuant to Sections 3(ii) and (iii) hereof, then the transferring Shareholder may sell all of the Offered Shares to the Outside Party on terms not more favorable to such Outside Party than those contained in the Offer. In the event that such terms are more favorable or if such sale to the Outside Party is not consummated within the time period specified in Section 3(v) hereof, the Offered Shares shall again be subject to the restrictions contained in this Agreement.

(v)     The closing for any purchase of Shares by the non-transferring Shareholders or the Corporation shall be held at 10:00 a.m. at the offices of the Corporation on the sixtieth (60th) day after the date of the Option Notice or at such other time and place as the parties shall agree. The closing of a purchase of the Offered Shares by an Outside Party shall occur within sixty (60) days after the giving of the Option Notice. At the closing, the non-transferring Shareholders, the Corporation or the Outside Party, as the case may be, shall pay for the Offered Shares in accordance with the terms of the Offer, the transferring Shareholder shall deliver certificates representing the Offered Shares free and clear of all liens, charges and encumbrances (other than those set forth herein) and properly endorsed for transfer and, if such Shares are being purchased by an Outside Party, such person shall agree to be bound by the terms of this Agreement in accordance with Section 2(e) hereof.

(vi) <u>Tag-Along Right</u>  If the Corporation does not exercise the Option provided in Section 3 (ii) hereof, each Shareholder that does not exercise the right to purchse provided for in Section 3 (iii) hereof (each a "Tag-Along Shareholder") shall have the right (the "Tag-Along Right") to require the transferring Shareholder to cause the Outside Party to purchase from such Tag-Along Shareholder that number of Shares held by such Tag-Along Shareholder as is equal to the product of the Offered Shares, multiplied by a fraction, the numerator of which is equal to the number of Shares held by such Tag-Along Shareholder, and the denominator of which is equal to the sum of (a) the number of Shares owned by such Tag-Along Shareholder, (b) the number of Shares owned by the transferring Shareholder and (c) the number of Shares owned by all other Tag-Along Shareholders who are exercising their Tag-Along Rights (the "Tag-Along Shares")

The sale of the Offered Shares (as reduced by the Tag-Along Shars) and the Tag-Along Shares shall be for the same consideration and otherwise on the same terms and conditions for all Shareholders as set forth in the Offer.

The Tag-Along Right shall be exercised by a Tag-Along Shareholder by notifying the transferring Shareholder and the Corporation in writing (the "Tag-Along Notice") within twenty (20) days after its receipt fo the Offer to the Shareholders.  The Tag-Along Notice shall state the number of Shares that such Tag-Along Shareholder proposes to include in such transfer to the Outside Party, which number shall not exceed the maximum number of Shares which such Tag-Along Shareholder would be entitled to include if all Tag-along Shareholders elected to participate in the Transfer to the fullest extent possible, determined as foresaid.  Failure by any Tag-Along Shareholder to deliver a Tag-Along Notice during such twenty (20) period shall be deemed to constitiue the election of such Tag-Along Shareholder not to exercise its Tag-Along Rights.

Within sixty (60) days of the dispatch of the offer to the transferring Shareholder, the transferring Shareholder shall deliver to each Shareholder that validly exercises its Tag-Along Right a notice setting forth the number of Shares that such Tag-Along Shareholder will be entitled to sell to the  Outside Party pursuant to this Section and the delivery instructions and procedures required to effectuate the transfer.  In the event that any Tag-Along Shareholder does not choose to participate in the transfer to the fullest extent possible, the transferring Shareholder shall have the right to include the number of Shares that such Tag-Along Shareholder would have been entitled to include but did not elect to include.

If the Outside Party does not purchase shares from the Tag-Along Shareholders at the same price and on the same terms and conditions as the Outside Party purchases them from the transferring Shareholder, then the transferring Shareholder shall not be permitted to transfer any shares to the Outside Party as set froth in the proposed transfer.  The Tag-Along Shareholders and the transferring Shareholder shall have the right, for a ninety (90) day period following dispatch of the offer, to transfer to the Outside Party the Shares proposed to be transferred on terms and conditions no more favorable to the transferring Shareholder and the Tag-Along Shareholders than those stated in the Offer.  Any shares that continue to be held by the transferring Shareholder or any such Tag-Along Shareholders after the earlier of the

conummsation of the proposed transfer and the expiration of such ninety (90) day period shal again be subject to this provision.

All reasonable costs and expenses incurred by any seller in connection with a transfer pursuant to this Section 3, including, without limitation, all reasonable attorneys fees, costs and disbursements and any reasonable finders fees or brokerage commissions, shal be allocated pro rata among the Shareholders transferring shares in such transfer, with each bearing that portion of such costs and expenses equal to the aggregate of such costs and expenses multiplied by a fraction, the numerator of which is the amount of the gross proceeds received by such shareholder from such transfer and the denominator of which is the total amount of the gross proceeds received by all the shareholders from such transfer.

4.    Transfer upon Death.

a)    Upon the death of the individual Shareholders (the "Deceased Shareholder"), the other Shareholders (the "Purchasing Shareholder/s") shall purchase, and the Deceased Shareholder's representative shall sell, all, but not less than all, of the Shares owned by him for the Purchase Price (as hereinafter defined) and in accordance with the procedures set forth in this Section 4.

(b)    The Determined Price shall be the sum of (i) the Deceased Shareholder's proportionate share of the book value of the Company as of the date of the Sale Event, as such book value shall be determined by the Corporation's independent certified public accountants in accordance with generally accepted accounting principles consistently applied and valued on the date of death and (ii) the Deceased Shareholder's proportionate share of the "Agreed Value" of the Corporation which shall, initially be $1,000,000. The Agreed Value shall be adjusted annually, by mutual agreement of the Shareholders, not later than thirty (30) days after the close of each fiscal year of the Corporation, and recorded on Exhibit A hereto. In the event that the Shareholders shall have failed to adjust the Agreed Value for any fiscal year in which a Sale Event occurs, as provided above, the Agreed Value for the immediately preceding fiscal year shall apply to such Sale Event

(c) The closing for any purchase of Shares pursuant to this Section 4 shall be held at 10:00 a.m. at the offices of the Corporation on the sixtieth (60th) day after the date of the Deceased Shareholder's death or at such other time and place as the parties shall agree. At the closing, the Purchasing Shareholders shall pay for all of the Shares in full by certified check, and the Deceased Shareholder's representative shall deliver certificates representing all of the Shares, free and clear of all liens, charges and encumbrances and properly endorsed for transfer.

5. Other Events Constituting Transfer of Shares.

(a)    Any one or more of the following events or conditions shall be deemed to constitute an offer to sell the Shares held by the Shareholder:

(i)    the filing of a petition in bankruptcy by or against the Shareholder;

(ii)    an adjudication that the Shareholder in an insane or incompetent person;

(iii)    any assignment by the Shareholder for the benefit of his or her creditors;

(iv)    the Shares becoming subject to transfer by any award or process of law.

(b)    Within thirty (30) days after the occurrence of an event described in Section 5(a) (each a "Sale Event"), the Shareholder or his or her trustee in bankruptcy, personal representative, guardian, executor, or administrator (as appropriate) shall give notice to the Company and the other Shareholders of such event, specifying the date of such event, describing in reasonable detail the nature of the event. Such notice shall be deemed to be the Offer Notice for purposes of Section 3, the number of Shares affected shall be the Offered Shares, and the purchase price for the Shares shall be the Determined Price (as defined below) multiplied by the proportionate share of the Shares to the total outstanding shares of the Company. If the Company has not received this notice upon the expiration of the thirty-day period, any Shareholder or director of the Company who has knowledge of such event may give notice to the Company at any time after the end of such period, and the notice shall be deemed to be the Offer Notice for all purposes of this Agreement. Upon their receipt of the Offer Notice, the Company and the remaining Shareholders shall have the right, but not the obligation, to purchase the Offered Shares in accordance with this Section, except that with respect to the occurrence of an event described in Section 5(a)(iv) (the disability of a shareholder), the Company shall be required to purchase the Offered Shares in accordance with this Section.

(c)    The Determined Price shall be the sum of (i) the transferring Shareholder's proportionate share of the book value of the Company as of the date of the Sale Event, as such book value shall be determined by the Corporation's independent certified public accountants in accordance with generally accepted accounting principles consistently applied and valued on the date of the Sale Event and (ii) the transferring shareholder's proportionate share of the "Agreed Value" of the Corporation which shall, initially be $1,000,000. The Agreed Value shall be adjusted annually, by mutual agreement of the Shareholders, not later than thirty (30) days after the close of each fiscal year of the Corporation, and recorded on Exhibit A hereto. In the event that the Shareholders shall have failed to adjust the Agreed Value for any fiscal year in which a Sale Event occurs, as provided above, the Agreed Value for the immediately preceding fiscal year shall apply to such Sale Event.

(d)    The closing for any purchase of Shares pursuant to this Section 5 shall be held at 10:00 a.m. at the offices of the Corporation on the sixtieth (60th) day after the date of the Sale Event or at such other time and place as the parties shall agree. At the closing, the Purchasing Shareholders shall pay for all of the Shares, and the Selling Shareholder shall deliver certificates representing all of the Shares, free and clear of all liens, charges and encumbrances and properly endorsed for transfer. Payment of the Purchase Price for the Shares pursuant to this

Section 4 shall be as follows (i) one third (1/3) of the Purchase Price at closing and (ii) the remaining two thirds (2/3) of the Purchase Price payable in sixty (60) equal monthly installments, with the first such installment to be paid at the closing of the purchase of such Shares and the remaining installments to be paid on the first day of each month thereafter. The obligation to make the installment payments hereunder shall be evidenced by a promissory note ("Note") bearing interest at a rate equal to the prime rate of interest set forth in The Wall Street Journal at the time of issuance and delivery of such promissory note.  The Purchasing Shareholders shall have the right to prepay at any time, in whole or in part, the balance payable by it hereunder and under the Note and there shall be a fifteen (15) day grace period prior to any default.  Any such prepayment shall be applied to the installments due hereunder in reverse chronological order of their due dates.

    6.  Operating Profit

       (a)  Net profit, if any, may be distributed by the Corporation to the Shareholders thereof according to their percentage ownership.

    7.  Sale or Liquidation of the Corporation

       (a)  In the event that the Corporation or any Shareholder thereof receives a bona fide offer in writing from a third party to purchase the Corporation or all of the outstanding shares thereof, and said sale is accepted, approved and ratified by a majority of the Shareholders in conformity with Section 12 hereof, or the Corporation is liquidated in accordance with this Agreement, the proceeds of such sale or liquidation shall be distributed in accordance with and subject to the following priorities:

       (i) First, to payment of all outstanding tax liabilities, if any;

       (ii) Thereafter, to payment of all debts incurred in the regular course of business, if any, other than those covered herein in subparagraph (iv);

       (iii) Thereafter, to the Shareholders by way of reimbursement of Shareholder equity as valued according to the Agreed Value of the Corporation set forth in this Agreement as of this date and in accordance with each Shareholder's pro rata share of the Corporation;

       (iv) Thereafter, to retire any indebtedness of the Corporation to Shareholders outstanding as of said date, which indebtedness shall be deemed subordinated to the foregoing return of Shareholder equity as set forth in paragraph 7(a)(iii) hereof;

       (v) Thereafter, pro rata to the Shareholders according to their percentage ownership of the Corporation.

    8.  Loans.

       (a)     If there shall be a loan ("Loan") due from the Corporation to a Shareholder whose Shares are being sold pursuant to this Agreement, the Loan shall be repaid by the Corporation pursuant to the term of the Promissory Note evidencing such loan or, if no note, in sixty (60) equal monthly installments, with the first such installment to be paid at the closing of the purchase of such Shares and the remaining installments to be paid on the first day of each month thereafter.  The obligation to make the installment payments shall be evidenced by a

promissory note bearing interest at a rate equal to the prime rate of interest set forth in The Wall Street Journal at the time of issuance and delivery of such promissory note. The Corporation shall have the right to prepay at any time, in whole or in part the balance payable by it hereunder and there shall be a fifteen (15) day grace period prior to any default. Any such prepayment shall be applied to the installments due hereunder in reverse chronological order of their due dates. The repayment of the Loan pursuant to the term of the note evidencing the Loan shall be repaid prior to any other payment by the Corporation to the Shareholders for dividends or profits over and above salary.

(b)     If there shall be a Loan due from a Shareholder to the Corporation at the time such Shareholder's Shares are subject to purchase hereunder for any reason, the Loan shall be repaid at the closing of the purchase of the Shares as a credit against the Purchase Price.

9.   Injunctive Relief; Specific Performance.

Each of the Shareholders acknowledges that his interest in the Corporation and this Agreement is unique to him, that his Shares cannot be readily purchased or sold in the open market and that the other Shareholders and the Corporation will be irreparably damaged in the event of a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any Shareholder which damages will not be measurable or compensable in money damages unless this Agreement shall be specifically enforced. In addition to any other remedy to which the other Shareholders or the Corporation may be entitled, the other Shareholders or the Corporation shall be entitled to a preliminary and permanent injunction, without showing any actual damage or threat of irreparable injury, and/or a decree for specific performance, without any bond or other security being required in connection therewith, in accordance with the provisions hereof.

10.   Officers.

Each Shareholder in such Shareholder's capacity as director of the Corporation agrees to vote for the election of the following persons as officers of the Corporation:

| Office | Name |
|---|---|
| President | LEONARD LEE, M.D. |
| Vice President | RICHARD CARTLEDGE, M.D. |
| Secretary | RICHARD CARTLEDGE, M.D. |
| Treasurer | LEONARD LEE, M.D. |

11.   Directors.

The number of directors shall be two (2). The names of the directors until the next regularly conducted annual meeting of the stockholders shall be:

Names
LEONARD LEE, M.D.
RICHARD CARTLEDGE, M.D.

Each Shareholder agrees to vote all of his Shares for the above named directors at each shareholders meeting

12.  Non-Compete and Non-Solicitation Restrictions.

(a)    The Shareholders hereby agree that during the time they are shareholders of the Corporation pursuant to the terms of this Agreement and until twenty four (24) months following the date on which they cease being a shareholder hereunder, they will not, directly or indirectly, for themselves or on behalf of any other person, firm, entity or other enterprise: (i) solicit or in any way divert or take away any person or entity that, prior to the date in question, was a client, customer, vender, contractor or subcontractor of the Corporation, any of its subsidiaries or affiliates; (ii) hire, entice away or in any other manner persuade any person who was an employee, consultant, representative or agent of the Corporation, any of its subsidiaries or affiliates prior to the date in question, to alter, modify or terminate their relationship with the Corporation, any of its subsidiaries or affiliates;  (iii) employ any such individual during his or her employment with the Corporation and for one (1) year after such individual terminates employment with the Corporation; (iv) take any action, including without limitation, the making of disparaging statements concerning the Corporation or its officers, directors or employees, that is reasonably likely to cause injury to the relationships between the Corporation or any of its employees and customers, clients, and prospective clients; (v) interfere or attempt to interfere with any transaction in which the Corporation was, is or intends to be involved, and (vi) consult with, act as agent for, or otherwise assist any Competitor (as hereinafter defined) to compete or prepare to compete with the Corporation, in any of their affairs.  The term "Competitor" for purposes of this Agreement shall mean any person or entity which at relevant times engages or is making plans to engage in whole or in part in business activities which are the same as, similar to or in competition with any business activity of the Corporation.

(b)    The Shareholders further agree that during the time they are shareholders of the Corporation pursuant to the terms of this Agreement and for a period ending twenty four (24) months following the date on which they cease being a shareholder hereunder, they will refrain from carrying on, within the continental United States any business which is the same as, similar to or in competition with the business of the Corporation, directly or indirectly, except in the normal course of business on behalf of the Corporation.  The term "carrying on a business" shall mean to directly or indirectly engage in any such business as a sole proprietor, partner, consultant, corporate officer, director, employee or stockholder.

(c)    The Shareholders acknowledge and agree that the Corporation has a legitimate interest in preventing them from exploiting or appropriating the goodwill of a client or customer of the Corporation which they acknowledge and agrees has been created and

maintained at the Corporation's expense and to the Corporation's competitive detriment and that the restrictive covenants contained in this Section 12 are reasonable to protect this legitimate interest.

(d)    The provisions of this Section 12 shall survive the termination of this Agreement and the Shareholder's status of a shareholder of the Corporation.

13. <u>Consulting Activities by Shareholders</u>

Shareholders Leonard Lee, M.D. and Richard Cartledge, M.D. hereto agree that any fees, remuneration or other consideration derived from or otherwise payable to them either individually or otherwise as a result of consulting by them dealing or relating diretly to intellectual property belonging to the Corporation shall be the sole property of the Corporation for so long as the Imperatores remain shareholders of the Corporation or for two years from the date hereof, whichever comes first.

14. <u>Consents</u>. Notwithstanding anything to the contrary contained herein, the consent of the holders of fifty five percent (55%) of the capital of the Corporation is needed for the following actions:

(a)    Merge or consolidate the Corporation with or into any other corporation or entity;

(b)    Sell, lease, or exchange all or substantially all of the assets of the Corporation;

(c)    Issue any additional shares of capital stock of the Corporation;

(d)    Amend this Agreement, the By-Laws or the Articles of Incorporation of the Corporation;

(e)    Sale, lease, license or other transfer of any intellectual property belonging to the Corporation;

(f)    The making or taking of any loan advance or guarantee to or from any person, firm or corporation which exceeds fifty thousand ($50,000.00) dollars;

(g)    Admit an additional Shareholder(s) to the Corporation;

(h)    Payment of any salary or other compensation to any Shareholder, and

(i)    To terminate, dissolve or liquidate the Corporation.

15. <u>Tax Distribution.</u>  To the extent it is legally able to do so, the Corporation shall make distributions to the Shareholders in amounts, at such times, as to enable the Shareholders to pay any and all taxes on allocations to them of the Corporation's profits.

16. <u>Miscellaneous</u>.

(a)    Each party hereto acknowledges that it or he has read this Agreement, understands it, and agrees to be bound by its terms, and further acknowledges and agrees that it is the complete and exclusive statement of the agreement and understanding of the parties regarding the subject matter hereof, which supersedes and merges all prior proposals, agreements and understandings, oral and written, relating to the subject matter hereof.

(b)    No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

(c)    If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.  In the event that any provision is declared invalid or unenforceable, the Shareholders and the Corporation agree to substitute for such invalid or unenforceable provision a new provision which reflects, to the closest extent possible, the intent of the parties.

(d)    Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, estates, heirs, legal representatives and permitted assigns and transferees.

(e)    The section headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of said actions.

(f)    This Agreement shall be governed by the laws of the State of New York. The Shareholders and the Corporation consent and agree that jurisdiction and venue for all legal proceedings relating to the subject matter of this Agreement shall lie exclusively with the appropriate federal or state court sitting within the State of New York, County of New York.

(g)    A copy of this Agreement shall be filed with the Secretary of the Corporation and kept with the records of the Corporation.

(h)    Any notice or other communication to be given hereunder shall be in writing and delivered personally or sent by certified or registered mail, postage prepaid, if to the Corporation, addressed to the Corporation at its then principal business address, and if to any Shareholder, addressed to him at his address as it appears herein. Unless otherwise provided in this Agreement, notice given pursuant to this section shall be deemed given as of the date of its receipt.

(i)    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(j)    All representations, warranties and agreements contained herein shall survive the execution and delivery of this Agreement.

(k)    This Agreement and the restrictions on transfer set forth herein shall terminate upon the occurrence of any of the following events: (i) cessation of the Corporation's business, (ii) bankruptcy, receivership or dissolution of the Corporation, or (iii) the voluntary agreement of all parties who are bound by the terms hereof.

(l)    Words of gender used in this Agreement shall be interpreted to include the other gender, and words in the singular number shall be interpreted to include the plural (and vice-versa), when the sense so requires.

(m)    Each Shareholder represents and warrants that he has had the opportunity to seek the advice of independent legal counsel prior to signing this Agreement, and that the Corporation has recommended that he obtain such counsel. Each Shareholder acknowledges that they have signed this Agreement under their own free will.

(n)    In the event that a Shareholder shall Transfer his Shares pursuant to the terms of this Agreement, such Shareholder shall submit to the Corporation his resignation as an officer and director of the Corporation, as the case may be, at such time and effective such date as the Transfer of Shares becomes effective.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

SHAREHOLDERS                           ADVANCED CANNULA, INC.

_____          By: _____
Leonard Lee, M.D.                          Leonard Lee, M.D., President

_____
Richard Cartledge, M.D.

_____
Mark Imperatore, by the entireties

_____
Daun Imperatore, by the entireties

## EXHIBIT A

| Name of Shareholder | Number of Shares Owned |
|---|---|
| Leonard Lee, M.D. | 20,000 |
| Richard Cartledge, M.D. | 20,000 |
| Mark and Daun Imperatore | 10,000 |

Agreed Value of the Corporation for Fiscal Year 2002: $1,000,000.00

## RIDER TO SUBSCRIPTION AGREEMENT

THIS RIDER is to that certain SUBSCRIPTION AGREEMENT between ADVANCED CANNULA, INC., a Nevada corporation (the "Issuer") and MARK IMPERATORE ("Investor") dated October __, 2002 (the "Agreement").

Intending to be legally bound, Issuer, Investor and the undersigned Shareholders hereby agree to amend and supplement the Agreement as follows:

1. In addition to the representations and warranties set forth in Article III of the Agreement, the Issuer and the Shareholders hereby represent and warrant to Investor as follows:

a. The written offering materials, business plans and prospectuses provided by the Issuer, the Shareholders and/or their agents (collectively, the "Offering Materials") are true, accurate and complete in all material respects, and are hereby incorporated herein by this reference.

b. The confidential and proprietary information, trade secrets, inventions, patents and patent rights, copyrights, trademarks and other intellectual property referred to in the Offering Materials have been assigned and transferred to the Issuer, and are now owned by the Issuer free and clear of any claims, rights, liens, encumbrances, royalty obligations or other restrictions.

2. The Shareholders hereby join in and agree to be bound to the representations and warranties of the Issuer set forth in the Agreement, as amended hereby.

IN WITNESS WHEREOF, the parties have executed this Rider, intending to be legally bound.

_____(SEAL)
Mark Imperatore

ADVANCED CANNULA, INC.

By:_____
Leonard Y. Lee, M.D., President

SHAREHOLDERS:

_____(SEAL)
Leonard Y. Lee, M.D.

_____(SEAL)
Richard G. Cartledge, M.D.

LN1 109282v1 10/02/02